[No. B009605. Second Dist., Div. Two. July 8, 1985.]

CHRISTOPHER O'NEIL, Plaintiff and Appellant, v.
RALPH DAKE et al., Defendants and Respondents.

COUNSEL

Clinton W. Holland and Dennis E. Nelson for Plaintiff and Appellant.

Patricia M. Coleman and John Nouskajian, Jr., for Defendants and Respondents.

OPINION

**ROTH, P. J.**—About 9 p.m. on July 5, 1982, appellant Christopher O'Neil was waiting at a bus stop located across the street from the gas station leased

and operated by respondent Jaime C. Gurrola, dba Gurrola Texaco Gas Station. Owing to the fourth of July holiday, the station had been closed since July 3 and did not reopen until the morning of July 6. Hoping to ascertain the time from a clock at the station, O'Neil, according to his version of what transpired, crossed the street and entered upon the station premises. While there he heard a dog barking. Fearing for his safety on account of the animal, he retreated, but returned when he discovered he had dropped a pair of sunglasses.

Ralph Dake, together with the barking dog, was inside his camper vehicle which was parked on the property. After having admonished O'Neil to leave the premises, Dake opened the door of the camper with a shotgun in hand. Following a brief interval, Dake fired the weapon at the ground as a warning shot. O'Neil was injured by the discharge.[1]

O'Neil sued Dake and Gurrola (see fn. 1), asserting the latter was liable on the alternative theories of agency or negligence as the possessor of land obligated to guard against foreseeable risks of harm to others which might arise from Dake's presence upon the premises. Gurrola, after denying liability in his answer to the complaint, brought a motion for summary judgment. At the initial hearing thereon, the trial court, in spite of its tentative decision to grant the motion, observed that: "THE COURT: I think that, you know, I'm kind of—I think you're going to—frankly, you're going to have some serious problems showing he is an employee. But, you know, I—generally speaking I'll give—particularly where a case isn't that old, relatively speaking, in our aging process it's new, I'm willing to give someone sixty days to finish up their discovery and then take their last shot on it and then go up or down.

"So if you want to—that would be sometime toward the end of June, I guess. Today is the 23rd [of April, 1984]. 25th of June sound okay?"

Neither side appeared at the continued hearing. When the matter was recalendared for July 23, 1984, O'Neil's counsel indicated "he would sub-

---

[1]In a subsequent criminal proceeding brought against Dake as a result of the incident, O'Neil maintained he had advised Dake, prior to the shooting, he was merely attempting to retrieve his sun glasses. Dake testified on the other hand he had heard no such explanation and that instead O'Neil had approached the camper on three occasions over a period of some thirty or more minutes and had ignored his repeated statements the station was closed and that O'Neil should leave.

Dake was acquitted of all criminal charges after testifying at his trial he had never previously fired the shotgun and that he did so in this first instance in order to protect himself, his camper and his dog. He thereafter was sued in the present civil action, together with respondent Gurrola, but was never served with process.

mit on the court's tentative." The summary judgment accordingly was granted. This appeal followed. We affirm.

In support of the motion for summary judgment Gurrola presented evidence that he had become the proprietor of the gas station on May 13, 1982, less than two months prior to the shooting; that from March of 1982 or thereabouts and up to May 13, 1982, he had while making arrangements to become proprietor infrequently seen Dake on the station property, either buying gas or having coffee with the station's then lessee, one Otis Bratcher; that, similarly, he had seen Dake's camper parked on the premises but that he did not know nor was he ever told that Dake prior to May 13, 1982, lived on the premises; that Dake, though he continued to be present on the property after Gurrola became proprietor, was a sporadic visitor who came and went unpredictably; that Dake's continued presence or right of access after that date was not a part of the bargain whereby Gurrola became proprietor; that no agreement of employment or otherwise existed between Gurrola and Dake; that Gurrola did not consider Dake a watchman over the property nor did he consider Dake's dog a watchdog; that Gurrola did not know that Dake owned or possessed a shotgun prior to the shooting; that two weeks prior to the shooting Dake announced to Gurrola that Dake had moved permanently to Oklahoma; and that during those two weeks Gurrola had not seen Dake on the premises.[2]

---

[2]Gurrola's deposition testimony, more specifically, was in part as follows:
"Q. BY MR. NELSON: [counsel for O'Neil] Do you know a Ralph Charles Dake?
"A. Yes.
" . . . . . . . . . . . . . . . . .
"Q. Did you know Mr. Dake before May 13, 1982?
"A. I had seen him, but I didn't know him.
"Q. Where had you seen him before May 13, 1982
"A. There at the station.
"Q. What was he doing there, if you can recall, when you first saw him?
"A. Drinking coffee.
" . . . . . . . . . . . . . . . . .
"Q. When did you first start negotiating with Mr. Bratcher to take over that station?
"A. Around January of that year [1982].
"Q. Had you gone to that station in January of 1982?
"A. Yes.
"Q. Did you see Mr. Dake at that time?
"A. No.
"Q. When is the next time that you went to the station after you went there in January? Did you go in February?
"A. Yes.
"Q. Did you see Mr. Dake at that time?
"A. I don't recall.
"Q. Did you go to that station in March?
"A. Yes.

Against this showing, and in an effort to establish it had been controverted in such fashion as to create triable issues of material facts sufficient to defeat

"Q. Did you see Mr. Dake at that time?
"A. I might have.
"Q. Where might you have seen him if you saw him in March of 1982?
"A. Would have been buying gas or drinking coffee.
". . . . . . . . . . . . . . . .
"Q. How many times . . . did you see the truck on that property before May 13, 1982?
"A. I wouldn't know.
"Q. Was it more than five times?
"A. Perhaps.
"Q. Was it always parked in the same location?
"A. Well, like I said, I seen it filling up and I seen it parked in the back, yes.
"Q. Prior to finishing your negotiations on May 13, 1982, did you ever ask Mr. Batcher who Mr. Dake was?
"A. No.
"Q. Did you ever ask him what the dog was doing there?
"A. No. I never did notice whether he was there or not.
"Q. Prior to May 13, 1982, did you know that Mr. Dake off and on lived on that premises in that truck.
". . . . . . . . . . . . . . . .
"A. No.
"Q. Your testimony this afternoon is that before May 13, 1982, you did not know that Mr. Dake lived on that property off and on?
"A. I didn't know.
"Q. When is the next time that you saw Mr. Dake on that property after May 13, 1982?
"A. I don't recall.
"Q. Was it before July 5, 1982?
"A. Yes.
"Q. How much before July 5?
"A. I wouldn't know. I couldn't tell you because I didn't pay attention to him. He was like a customer. He would pull up and I had too much things [sic] that I had to do. I had just taken over the business for the first time and I wasn't paying attention who was there and who wasn't there at the time.
". . . . . . . . . . . . . . . .
"Q. Well, I can appreciate that, but what I am trying to get at is were you aware on July 5, 1982, at approximately between 8:30 and 9:30 p.m., that Mr. Dake was in his trailer or in his camper at a closed gas station at 14562 East Valley Boulevard?
"A. At that time my knowledge was that he had gone to Oklahoma and he wasn't going to return.
"Q. When did he go Oklahoma?
". . . . . . . . . . . . . . . .
"A. I can tell you it is two weeks prior to July 5 that he had gone, two weeks or ten days that he had left that I do know for a fact that he wasn't there.
". . . . . . . . . . . . . . . .
"Q. Did he say that he was going to stay on your property?
"A. No.
"Q. What type of an agreement did you have, if you had an agreement, with him?
"A. I had no agreement with him. He would just show up and there he was. I couldn't do nothing about it.
". . . . . . . . . . . . . . . .
"Q. After he got released [from jail], he talked to you?
"A. Yes.
". . . . . . . . . . . . . . . .

the motion in terms of either or both of the theories set out in appellant's complaint, O'Neil urged below and reiterates here that there was evidence to the effect Gurrola referred to Dake's dog as a "police dog"; that Dake, in warning O'Neil prior to the shooting, had advised O'Neil the station was closed; that Dake was aware people were always prowling around the station, stealing gas and batteries, and otherwise was knowledgeable about the premises; and that Gurrola employed no private patrol service. Additionally, O'Neil claims, the evidence already recited hereinabove that Gurrola knew of Dake's presence on the premises, that Dake owned a dog, that he was there primarily at night, and that he was again present on the property after the shooting, in and of itself creates inferences adequately tending to show for purposes of opposing the motion both that Dake was Gurrola's agent and that Gurrola, as the possessor of the property, could and should have foreseen that Dake's course of conduct created an unreasonable risk of harm to others, such as to give rise to a duty of care on Gurrola's part. (See generally *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40 [123 Cal.Rptr. 468, 539 P.2d 36].) We disagree.

"Q. What did you say to him?
"A. He shouldn't have done it.
"Q. He shouldn't have done what?
"A. Shot somebody.
"Q. What was his response to that?
"A. It was self-defense.
"Q. Why do you say it was self-defense?
"A. He was afraid for his life.
"Q. Anything else?
"A. That the person that he had shot kept on coming back and he kept on telling him to go away.
"Q. How many times did he say the person came back?
"A. Three times.
"Q. Over what period of time?
"A. He said about 45 minutes.
"Q. Did he say that he was threatened at all?
"A. He said he just feared for his dog and himself.
"Q. And he said that is why he shot him?
"A. Because he kept on coming up and he kept on telling him to go away, and he thought he was going to come into his camper and work him over.
"Q. Did he say anything else?
"A. I don't recall.
"Q. Were you satisfied with his explanation?
"A. I wasn't involved, so it didn't concern me.
". . . . . . . . . . . . . . . . . . .
"Q. Do you allow other people to leave vehicles or campers overnight on your property?
"A. Yes.
"Q. Is this a standard procedure?
"A. Yes.
". . . . . . . . . . . . . . . . . . .
"Q. Did you consider Mr. Dake's dog a watch dog?
"A. No.
". . . . . . . . . . . . . . . . . . .
"Q. Do you consider Mr. Dake a watchman at your place?
"A. No."

The operative statute herein, i.e., Code of Civil Procedure section 437c provides in pertinent part that: "(a) Any party may move for summary judgment in any action or proceeding if it is contended that the action has no merit or that there is no defense thereto. . . .

"(c) The motion shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers . . . and all inferences reasonably deducible from such evidence, except summary judgment shall not be granted by the court based on inferences reasonably deducible from such evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact.

". . . . . . . . . . . . . . . . . . . . . . . . .

"(e) If a party is otherwise entitled to a summary judgment . . . summary judgment shall not be denied on grounds of credibility or for want of cross-examination of witnesses furnishing affidavits or declarations in support of the summary judgment, except that summary judgment may be denied in the discretion of the court, where the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to such fact; . . .

". . . . . . . . . . . . . . . . . . . . . . . . .

"(h) If it appears from the affidavits submitted in opposition to the motion that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as may be just.

". . . . . . . . . . . . . . . . . . . . . . . . .

 As is apparent from the language employed in the code section, what is required where, as in the case of appellant's opposition, reliance is placed on inferences (see Evid. Code, §§ 140, 410, 600) is that those inferences be *reasonably deducible* from evidence, and not such as are derived from speculation, conjecture, imagination or guess work. (See *Cothran* v. *Town Council* (1962) 209 Cal.App.2d 647, 664 [26 Cal.Rptr. 319]; *Marshall* v. *Parkes* (1960) 181 Cal.App.2d 650, 655 [5 Cal.Rptr. 657]; Evid. Code, § 600.) Stated otherwise, where by competent evidence a party seeking summary judgment has made a prima facie showing of entitlement thereto,

that showing is in no wise controverted, much less defeated, by inferences based entirely on tortured reasoning or logic strained to the breaking point, and this is true even though it is accepted as the general rule that such relief, if granted, will occasion reversal by an appellate court where "any kind of a case [has been] shown." (Cf. *Levin* v. *State of California* (1983) 146 Cal.App.3d 413, 414 [194 Cal.Rptr. 223].)

 Here, in the face of substantial and competent evidence supporting a contrary conclusion, and after the trial court prudently provided O'Neil the opportunity to strengthen his own showing, it is contended, in essence, that Gurrola might be held liable for O'Neil's injury on the bases that Gurrola for a short time prior to the shooting was aware Dake, like others (see fn. 2), sometimes parked overnight at the station, that Dake was generally familiar with the station and knew it often was criminally victimized, that Gurrola otherwise had not hired private assistance to prevent criminal activity on the premises, and that Dake kept a dog which was described by Gurrola as a "police dog." Based on the principles hereinabove delineated, we are of the opinion that contention cannot be sustained.[3]

The judgment appealed from is affirmed.

Beach, J., and Gates, J., concurred.

---

[3]O'Neil's further contention that the motion for summary judgment should have been denied by virtue of the exception specified in Code of Civil Procedure section 437c, subdivision (e), set out above, is likewise not well taken, it being the case that Gurrola was not the sole witness to the pertinent facts involved, even though he may have been the only witness who testified as to those facts.