[No. A078486. First Dist., Div. Two. Oct. 30, 1998.]

SUSANNA TOIGO et al., Plaintiffs and Appellants, v.
TOWN OF ROSS et al., Defendants and Respondents.

**COUNSEL**

Clement, Fitzpatrick & Kenworthy and Clayton Emerson Clement for Plaintiffs and Appellants.

Shute, Mihaly & Weinberger, Fran M. Layton; and Hadden Wing Roth for Defendants and Respondents.

**OPINION**

**RUVOLO, J.—**

## I.

### INTRODUCTION

By this action, appellants Susanna Toigo, H. Skip Berg and Brenda Berg (collectively, Toigo), sought to compel respondents the Town of Ross, the Town Council of the Town of Ross, and current and former town councilmembers Charles Goodman, Kelley Reid, Peter Barry, John Scott, and Mary Brown (collectively, the Town) to set aside the denial of Toigo's 1994 application for a five-lot subdivision on their hillside property. Toigo challenged the Town's decision on numerous grounds, three of which concern us here: 1) the Town abused its discretion in denying Toigo's subdivision application; 2) the Town is estopped from taking any action to deny Toigo's subdivision application by reason of the Town's prior approval of the

subdivision's design; and 3) the regulation and restraint of Toigo's property constitutes a taking under the just compensation clause of the Fifth Amendment. (U.S. Const., 5th Amend.) The trial court rejected these arguments and entered judgment for the Town after denying Toigo's petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5)[1] and granting the Town's motion for summary adjudication (§ 437c, subd. (f)(1)). We affirm.

## II.

### FACTS

In February 1989, Toigo purchased 36.5 acres of undeveloped property in the Town of Ross for $1.75 million. The property lies adjacent to Natalie Coffin Greene Park and Marin Municipal Water District lands. It is characterized by steep slopes, ridgelines, large numbers of oak trees, extensive native vegetation, rock outcroppings, and substantial areas of species habitat. The property is designated "Very Low-Density" in the Ross General Plan, which restricts density to one to ten acres per dwelling unit. At the time of the underlying proceedings, the property was zoned R-1:B-5A, which requires a minimum lot size of five acres. It is located in the "Hillside Lot Hazard Zone," which permits construction of single-family homes provided that the environmental constraints typically found in Ross's steeply sloping hillsides can be avoided or mitigated.

On September 22, 1994, Toigo submitted a subdivision map and related applications to the Town to subdivide the property into five residential lots, together with related access roadway, driveways, and utilities. Almost six months after receiving an initial letter of incompleteness from the Town, Toigo submitted a significantly revised subdivision map on April 17, 1995. Among other things, the revised map added a new 1,300-foot-long access road and a 50,000-gallon water tank on portions of the property that were to be left undeveloped under the original application. On May 12, 1995, the Town again notified Toigo that their revised application was incomplete because it failed to provide all the necessary information relating to the revision. After receiving the required information, Toigo's application was deemed complete on June 15, 1995.

A staff report prepared on August 7, 1995, compared the revised application with Toigo's prior five-unit subdivision application, which the Town denied in 1991. The Town's 1991 denial was primarily based on the inconsistency of Toigo's 1990 subdivision application with the open space

---

[1] All further undesignated statutory references are to the Code of Civil Procedure.

provisions of the Ross general plan and zoning ordinance. Toigo filed a writ of administrative mandate to set aside the Town's decision. The trial court issued the writ, but the Court of Appeal upheld the project's denial on the ground that the Town did not abuse its discretion in finding Toigo's 1990 application was inconsistent with the general plan. (*Berg* v. *Town of Ross* (Feb. 24, 1995) A057967 [nonpub. opn.].)

The report found that while the 1994 application contained substantial changes to the shape, size, boundaries and design of the five proposed lots and the access roadway, this revised design would result in environmental impacts "*substantially more severe*" than those considered in Toigo's 1991 application. (Italics added.) The report explains that "[t]he revised grading plan now proposed for the subdivision results in the disturbance of new areas, addition of fill to new areas, construction of additional retaining walls, construction of higher retaining walls, removal of additional trees and a doubling of the amount of excess earth for off-site disposal." The report also discussed relevant new information—such as the devastating 1991 Oakland hills fire—which added to the already serious safety concerns regarding the exceedingly steep grades of the proposed roadway and driveways.

At a July 13, 1995, public hearing on Toigo's subdivision application, staff, councilmembers and members of the public alike voiced serious concerns about the proposal, including fire safety, visual impacts, the effect of the project on the surrounding neighborhood, parking, grading, tree removal and lot design. In view of these pervasive concerns, the Town directed its staff to further analyze the proposal. The subsequent staff report issued July 28, 1995, documented the project's inconsistency with the Town's general plan, subdivision ordinance standards, and other land use requirements. The report observed, "An Environmental Impact Report was prepared for the 1990 application to develop a [five]-lot subdivision on this site. Despite the information obtained from this prior EIR, the current submittal is not an improvement over the earlier submittal. . . . [T]his proposal, in many respects, is actually worse than the 1990 submittal." The report concludes with the following advice: "[T]he applicant should redesign the project to propose economically viable development, which complies with the requisite Town regulations and harmonizes with the existing environment. Meaningful environmental review of this proposal can occur once the project design complies with minimum, basic Town regulations."

On August 10, 1995, after providing Toigo additional time to respond to the staff report and hearing additional public testimony, the town council unanimously denied the development application and adopted findings regarding its environmental, safety and aesthetic impacts and its inconsistency

with local planning requirements. The Town found that preparation of an environmental impact report (EIR) would be a costly exercise in futility "because the project is fundamentally flawed and is inconsistent with numerous provisions of the General Plan, zoning regulations and local and state subdivision regulations."

Toigo filed this action on October 11, 1995. After an initial demurrer by the Town, Toigo filed their "Second Amended Verified Petition for Writs of Mandamus or Prohibition and Complaint for Damages and Declaratory Relief." The amended complaint, which was filed on January 29, 1996, challenged the denial of Toigo's 1994 subdivision application on numerous grounds, including an estoppel theory. Toigo alleged they had reasonably relied, to their detriment, on assurances that the Town would approve a subdivision designed in accordance with certain design specifications recommended at the time their 1990 subdivision application was denied. Having redesigned their proposal in accordance with these recommendations, Toigo claimed the Town was estopped from promulgating findings claiming this design was inconsistent with local land use policies. Toigo also alleged that the Town's denial of their five-lot subdivision application deprived them of any viable economic value or use of their property, thus amounting to an unconstitutional taking. In Toigo's administrative mandamus claim, they alleged the Town prejudicially abused its discretion in denying Toigo's 1994 development proposal by failing to adopt adequate findings and by adopting findings that were not supported by substantial evidence.

After the Town successfully demurred to Toigo's estoppel claim, the Town filed a motion for summary adjudication of numerous remaining claims, including their cause of action alleging an unconstitutional taking. On March 18, 1997, after completion of briefing and a hearing, the trial court issued an order granting the Town's summary adjudication motion and denying Toigo's request for writ relief, which effectively disposed of Toigo's entire action. This appeal followed.

### III.

### DISCUSSION

#### A. Trial Court's Denial of Administrative Mandamus

Toigo mounts a perfunctory challenge to the Town's decision to deny the 1994 five-unit development application as "an abuse of discretion, unsupported by appropriate findings, and unsupported by substantial evidence." Toigo raised this issue below in their petition for writ of administrative mandamus (§ 1094.5). The court denied the requested relief after

concluding that Toigo "failed to establish an abuse of discretion because the Town's denial of their subdivision and other applications was supported by findings and, considering the entire record, the findings were supported by substantial evidence . . . ."

■ Where, as here, a land use decision is challenged by administrative mandamus, courts are to apply the substantial evidence standard of review. (§ 1094.5, subd. (c); *Desmond* v. *County of Contra Costa* (1993) 21 Cal.App.4th 330, 334 [25 Cal.Rptr.2d 842]; *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1989) 214 Cal.App.3d 1348, 1356, fn. 4 [263 Cal.Rptr. 214].) ■ With respect to Toigo's conclusory challenge to the Town's exercise of discretion, Toigo's brief so flagrantly violates established rules of appellate procedure that this assignment of error is deemed waived. Toigo fails to set forth any statement of the Town's findings or the evidence used to support those findings. ■ "When appellants challenge the sufficiency of the evidence, all material evidence on the point must be set forth and not merely their own evidence. [Citation.] Failure to do so amounts to waiver of the alleged error and we may presume that the record contains evidence to sustain every finding of fact. [Citation.]" (*Jordan* v. *City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1255 [54 Cal.Rptr.2d 340]; see also *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) ■ Although summary disposition of Toigo's first contention is warranted, we nevertheless briefly discuss the evidence supporting the Town's decision to deny Toigo's application for the five-lot subdivision to lay to rest any doubt that the Town's decision was amply supported.

At the outset, we reiterate our admonition in *Sequoyah Hills Homeowners Assn.* v. *City of Oakland* (1993) 23 Cal.App.4th 704 [29 Cal.Rptr.2d 182], that it is "*not* the role of the courts to micro-manage these development decisions. Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence. [Citations.]" (*Id.* at pp. 719-720, original italics.)

There is no question that the record before us easily meets this standard. The Town's decision to deny Toigo's subdivision application was supported by 38 pages of findings. The findings methodically detail how Toigo's proposal conflicted with distinct provisions of the Ross General Plan. For example, the findings pointed out that the proposed improvements—which would require a cut of 12,500 cubic yards of earth, substantial tree removal, and an extensive network of retaining walls—are inconsistent with the

general plan policies requiring the protection of natural resources, the environment, open space and community character.

The Town also found that the long, narrow and exceedingly steep road providing access to the proposed subdivision created serious fire safety risks that conflicted with the general plan's safety policies. The findings further documented the glaring conflicts between Toigo's proposal and numerous specific requirements set forth in the Town's ordinances and its applied standards. The findings explained that approving Toigo's proposal would necessitate "[six] exceptions from Subdivision Ordinance Standards, eleven exceptions from Town-applied Roadway and Driveway Design Standards, two exceptions from Zoning Ordinance requirements, a setting aside of eight hillside lot criteria, and a setting aside of ten design review criteria." There is no question that these findings support the denial of Toigo's application.

Toigo's brief is peppered with references to the Town's "illegal and unjustified delay" in acting on Toigo's 1994 application "in order to initiate downzoning potentially fatal to the subdivision, . . ." Toigo's reference to "downzoning" referred to the fact that on December 4, 1995, several months *after* the Town denied Toigo's 1994 subdivision proposal, the Town approved amendments to the zoning for Toigo's property requiring a 10-acre minimum lot size. The essence of this argument, as we understand it, is if Toigo's application had been acted upon in a timely manner and approval ultimately granted when the five-acre minimum was in effect, Toigo could have commenced substantial work on the project prior to effective date of the zoning amendment. Under these circumstances, Toigo would have acquired vested rights in the original zoning designation. (See *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 791 [132 Cal.Rptr. 386, 553 P.2d 546].)

However, Toigo does not claim that the Town failed to comply with statutorily based time guidelines in processing their application (see, e.g., Gov. Code, § 65943, subd. (b)); nor is the legality of the rezoning questioned in this appeal. Moreover, we are precluded from examining the motives of the regulatory body which acted on Toigo's subdivision application—we can only measure the legality of its actions. (*Mira Development Corp.* v. *City of San Diego* (1988) 205 Cal.App.3d 1201, 1220-1221 [252 Cal.Rptr. 825]; *Anderson* v. *City Council* (1964) 229 Cal.App.2d 79, 91 [40 Cal.Rptr. 41].)

The trial court recognized that the pertinent question was whether the development of Toigo's subdivision was prohibited by the regulations and zoning *in effect at the time the development application was made*. The court made the specific finding "[t]he Town's decision to deny [Toigo]'s application was based on a multitude of reasons separate and apart from the Town's

rezoning of [Toigo]'s property." Given the ample evidentiary support for this finding, it was reasonable for the trial court to conclude that the subsequent rezoning of Toigo's property had no bearing on the Town's decision to deny Toigo's 1994 subdivision application.

█ Toigo also claims that in denying its 1994 subdivision application, the Town failed to make mandatory findings under Government Code section 65589.5, subdivision (j). This statutory provision states that a local agency cannot disapprove a "housing development project" which complies with the general plan and zoning laws except "upon written findings supported by substantial evidence on the record that" the "project would have a specific, adverse impact upon the public health or safety" and "[t]here is no feasible method to satisfactorily mitigate or avoid the adverse impact . . . ." (Gov. Code, § 65589.5, subd. (j)(1) and (2).) In denying Toigo's request for administrative mandamus, the court rejected Toigo's contention that such findings were necessary. The court reasoned that "the Town was not required to make findings under Government Code section 65589.5(j) because the proposed project was not consistent with applicable general plan and development policies." We believe the trial court correctly analyzed this question under prevailing law. (See *Mira Development Corp.* v. *City of San Diego, supra,* 205 Cal.App.3d at p. 1223.)

## B. *Estoppel*

█ Toigo claims that the Town is estopped from finding their 1994 subdivision application inconsistent with various planning standards. Central to Toigo's estoppel argument is their contention that in denying Toigo's 1990 application, the Town made findings encouraging Toigo to redesign the lots in their proposed subdivision using a clustered design so that the development would be more consistent with the Town's open space policies.

Toigo claims they "acted in good faith reliance upon the express direction provided by the Town in Resolution No. 1281, and submitted an application redesigning their project to be 'similar to the Revised Clustered Alternative I,' only to have that application denied based on findings directly contradicting those adopted by the Town in 1991." Resolution No. 1281, which was adopted by the Town in conjunction with the denial of Toigo's 1990 application, reads in pertinent part as follows: "WHEREAS, this Town Council finds that a revised project design similar to the Revised Clustered Alternative I evaluated in the EIR Attachment would meet the intent of the General Plan policies to protect upland ridges and community separators in open space by clustering all five housing units on the lower slopes of the project site while still maintaining lot sizes that are consistent with the

General Plan . . . . [¶] Now, THEREFORE, BE IT RESOLVED, that the Town Council . . . den[ies] the [application] . . . without prejudice for a future revised application which would better respond to the policies of the Ross General Plan and Zoning Ordinance."

Toigo claims it "acted in good faith reliance" on the Town's assurance that any future five-unit cluster alternative would be "reviewed by the Town in accordance" with these recommendations, and Toigo redesigned their 1994 development proposal in a manner conforming to the revised clustered alternative evaluated in the EIR. Under these circumstances, Toigo claims the Town should be estopped from asserting facts and adopting findings determining that the design methodology used in Toigo's 1994 subdivision application was inconsistent with various planning standards.

Toigo's estoppel argument was soundly rejected by the trial court when it ruled on Toigo's request for mandamus relief. The court held: "By its very *general* statements endorsing the *concept* of clustered alternative I, the Town could not have misled [Toigo] into reasonably believing that their 1994 proposal would comply with applicable policies. . . ." (Original italics.) "Further, substantial evidence shows the differences between the 1994 proposal and clustered alternative I [citations]."[2]

▇ Toigo seeks to avoid the court's ruling by asserting that the "existence of an estoppel is a question of fact for the trier of fact." We recently addressed this very argument in *Estate of Anderson* (1997) 60 Cal.App.4th 436 [70 Cal.Rptr.2d 266]: "Generally, the determination of estoppel is a factual question; and the finding of the trier of fact is binding on the appellate court. [Citations.] However, when the facts are undisputed and only one inference reasonably may be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling. [Citations.]" (*Id.* at pp. 440-441.) ▇ The facts material to a resolution of the estoppel issue in this case are undisputed. The Town concedes it made the statements pertaining to the cluster alternative when it rejected Toigo's 1990 application, and that these statements were a matter of record before the trial court.

---

[2]The trial court had previously sustained the Town's demurrer to the allegations in Toigo's complaint alleging estoppel. Relying on similar reasoning to that utilized in denying mandamus relief, the court held Toigo "failed to allege sufficient facts to support their claims of promissory, equitable or collateral estoppel, . . . . The court finds the reliance here on a 'recommended' conceptual alternative (which itself only addressed open space policies), made in connection with the denial of a prior application, is unreasonable to the extent [Toigo] assert[s] such an informal recommendation can now estop the Town from considering the merits of a subsequent application and whether such application is consistent with all of the applicable policies of the general plan, and the numerous standards and regulations with respect to the Town's ordinances, etcetera."

Therefore, we independently review whether the doctrine of estoppel can be applied against the Town to invalidate many of the findings it relied upon in denying Toigo's subdivision application.

■ The principle of estoppel, when invoked in this context, prohibits a governmental entity from exercising its regulatory power to prohibit a proposed land use when a developer incurs substantial expense in reasonable and good faith reliance on some governmental act or omission so that it would be highly inequitable to deprive the developer of the right to complete the development as proposed. (See *Patterson* v. *Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 844 [130 Cal.Rptr. 169].) The theory of equitable estoppel simply recognizes that, at some point in the development process, a developer's financial expenditures in good faith reliance on the governmental entity's land use and project approvals should estop that governmental entity from changing those rules to prevent completion of the project.

We note at the outset that Toigo faces daunting odds in establishing estoppel against a governmental entity in a land use case. Courts have severely limited the application of estoppel in this context by expressly balancing the injustice done to the private person with the public policy that would be supervened by invoking estoppel to grant development rights outside of the normal planning and review process. (*Avco Community Developers, Inc.* v. *South Coast Regional Com.*, *supra*, 17 Cal.3d at p. 800.) The overriding concern "is that public policy may be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits." (*Smith* v. *County of Santa Barbara* (1992) 7 Cal.App.4th 770, 775 [9 Cal.Rptr.2d 120].) Accordingly, estoppel can be invoked in the land use context in only "the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow." (*Ibid.*)

This is not such a case. Courts and commentators alike recognize that there is no meaningful distinction between an estoppel claim and a vested right claim where land use is at issue. (*Avco Community Developers, Inc.* v. *South Coast Regional Com.*, *supra*, 17 Cal.3d at p. 793; *Raley* v. *California Tahoe Regional Planning Agency* (1977) 68 Cal.App.3d 965, 975, 985 [137 Cal.Rptr. 699]; *Patterson* v. *Central Coast Regional Com.*, *supra*, 58 Cal.App.3d at p. 844; 4 Manaster & Selmi, Cal. Environmental Law & Land Use Practice (1998) § 60.73[3][a], 60-114.11.) In California, the developer's right to complete a project as proposed does not vest until a valid building permit, or its functional equivalent, has been issued and the developer has performed substantial work and incurred substantial liabilities in good faith reliance on the permit. (*Avco Community Developers, Inc.* v. *South Coast*

*Regional Com., supra,* 17 Cal.3d at p. 791; *Raley* v. *California Tahoe Regional Planning Agency, supra,* 68 Cal.App.3d at p. 975; *Del Oro Hills* v. *City of Oceanside* (1995) 31 Cal.App.4th 1060, 1082-1083 [37 Cal.Rptr.2d 677].) Courts have yet to extend the vested rights or estoppel theory to instances where a developer lacks a building permit or the functional equivalent, regardless of the property owner's detrimental reliance on local government actions and regardless of how many other land use and other preliminary approvals have been granted. To the contrary, it has been stated that " '[w]here no such permit has been issued, it is difficult to conceive of any basis for such estoppel.' [Citations.]"[3] (*Patterson* v. *Central Coast Regional Com., supra,* 58 Cal.App.3d at p. 844.) California courts apply this rule most strictly, although it has been criticized as "giv[ing] a green light to administrative vacillation virtually up to the moment the builder starts pouring concrete." (*Raley* v. *California Tahoe Regional Planning Agency, supra,* 68 Cal.App.3d at p. 985.)

The rigidity of the "building permit" rule is illustrated by *Consaul* v. *City of San Diego* (1992) 6 Cal.App.4th 1781 [8 Cal.Rptr.2d 762]. The court in *Consaul* held that a developer of an unimproved parcel had no vested right to build a 26-unit building, which had been approved under an interim development ordinance, when the parcel was subsequently rezoned for single-family dwellings. Although the developer had not applied for a building permit, a subdivision map had been filed, consultants had been retained, and $7,200 had been spent in start-up costs. In seeking a writ of mandate, the developer argued that the rezoning of the property was done in violation of previously vested rights allowing the development of 26 units, upon which the developer reasonably relied to his detriment and which the city was estopped to deny. The court rejected this argument, concluding "that even though a dwelling unit allocation was made, no vested right to proceed with the development project was created thereby." (*Id.* at p. 1797.) The court noted that the government's "promise" that the developer could build 26 units was limited by the requirement that a building permit and final plan check be obtained. (*Id.* at p. 1800.) Therefore, the city was not estopped from rezoning the developer's property, because in the absence of the issuance of a building permit and final approval, the developer did not have a vested right to complete the 26 units as proposed. (*Id.* at pp. 1800-1801.)

The First Appellate District case of *Penn-Co* v. *Board of Supervisors* (1984) 158 Cal.App.3d 1072 [205 Cal.Rptr. 298] illustrates that even where

---

[3]There have been legislative enactments bearing directly on this subject. The Legislature has extended vested rights protection to a property owner who has obtained a vesting tentative map or who has entered into a development agreement. (Gov. Code, §§ 65866, 66498.1, subd. (b).) Toigo does not and cannot allege that they have obtained either of these documents.

a governmental entity initially determines that a development proposal is consistent with a general plan, reliance on such a determination as an assurance of final approval is unreasonable *as a matter of law*. Penn-Co purchased property shortly after the county's board of supervisors found Penn-Co's proposed commercial use for the property was consistent with the county's general plan. (*Id.* at pp. 1075-1076.) Penn-Co then expended substantial funds on the preparation of an environmental impact report and the preparation of materials necessary for obtaining a use permit. After these expenditures and actions, the board of supervisors granted an appeal which in effect overruled the zoning administrator's initial decision to grant Penn-Co a use permit. (*Id.* at p. 1076.)

On appeal, the court rejected Penn-Co's argument that it reasonably relied on the board's earlier consistency finding in purchasing the property and expending money for its commercial development and that, under these circumstances, the board should be estopped from overturning its decision. The court found "*as a matter of law* that this reliance was unreasonable, and was insufficient to invoke the doctrine of estoppel particularly in the context of the importance to the public of maintaining the integrity of the general plan." (158 Cal.App.3d at p. 1081, italics added.) The court held that Penn-Co had not fulfilled the necessary requirement of reasonable reliance because it knew that the original "consistency finding was merely one step along the road to obtaining a permit. . . . When Penn-Co purchased the property relying on the initial finding of consistency by the Board, before a final decision by the zoning administrator on the use permit application, it was taking a business risk. Penn-Co could not reasonably have assumed that this finding was absolute assurance that its application would not falter at another step along the way." (*Ibid.*)

Thus, neither site-specific approval for development at a certain density (*Consaul* v. *City of San Diego, supra,* 6 Cal.App.4th 1781) nor work undertaken pursuant to a specific finding of consistency with the general plan (*Penn-Co* v. *Board of Supervisors, supra,* 158 Cal.App.3d 1072) can legally form the basis of an estoppel guaranteeing the completion of the project as originally proposed. Considering *Consaul* and *Penn-Co* represent *far stronger* cases for application of estoppel principles than the undisputed facts presented by this case, it is hard to envision on what basis Toigo would be awarded equitable relief.

 Here, Toigo obtained no permits or preliminary approvals whatsoever. As the trial court held, the "clustered alternative" was a conceptual, informal recommendation which addressed only the Town's open-space policies and did not address consistency with other equally important policies promulgated to protect public health, safety, and welfare. Therefore, the

Town's general endorsement of a "clustered alternative" could not be viewed as the functional equivalent of a building permit establishing a vested right to proceed with the project, nor could it serve to deprive a future governmental entity of its regulatory discretion. Consequently, we find as a matter of law that Toigo could not reasonably believe that by designing the project in conformance with this recommended approach, it would effectively be immunized from further discretionary review necessary to construct the planned subdivision. To hold otherwise would seriously impair "the government's right to control land use policy." (*Avco Community Developers, Inc.* v. *South Coast Regional Com.*, *supra*, 17 Cal.3d at p. 797.)

## C. *Taking Claim*

In the underlying action, Toigo alleged that the Town's denial of their five-lot subdivision application deprived them of any viable economic value or use of their property, and thus amounted to an unconstitutional taking requiring just compensation under the Fifth Amendment to the United States Constitution. (See also Cal. Const., art. I, § 19.)

In ruling on the Town's motion for summary adjudication of the taking issue, the trial court held the evidence "conclusively shows" that Toigo's takings claim "is not ripe for judicial review." The court found the undisputed material facts did not support "a reasonable inference that the [T]own made a 'final and *authoritative* determination of the type and intensity of development legally permitted on the subject property.' [Citation]." The court concluded Toigo had not yet obtained a final decision because "denial of approvals for a particular and *relatively intensive* development 'cannot be equated with a refusal to permit *any* beneficial use whatsoever.' [Citation.]" (Original italics.)

In order to establish entitlement to summary adjudication, the moving party must establish that the cause of action is without merit by negating an essential element or by establishing a complete defense. (§ 437c, subd. (f); *City of Emeryville* v. *Superior Court* (1991) 2 Cal.App.4th 21 [2 Cal.Rptr.2d 826].) A motion for summary adjudication proceeds in all procedural respects as a motion for summary judgment. (*Haskell* v. *Carli* (1987) 195 Cal.App.3d 124, 130 [240 Cal.Rptr. 439].) On appeal, our review is de novo. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1511-1513 [285 Cal.Rptr. 385].)

It has been recognized that "an undue restriction on the use of private property is as much a taking for constitutional purposes as appropriating or destroying it. [Citations.]" (*Candlestick Properties, Inc.* v. *San*

*Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557, 572 [89 Cal.Rptr. 897], italics omitted.) The United States Supreme Court has referred to a regulation that " 'goes too far' " as a taking. (*Suitum* v. *Tahoe Regional Planning Agency* (1997) 520 U.S. 725, 734 [117 S.Ct. 1659, 1665, 137 L.Ed.2d 980]; *Williamson Planning Comm'n* v. *Hamilton Bank* (1985) 473 U.S. 172, 186 [105 S.Ct. 3108, 3116, 87 L.Ed.2d 126]; *Agins* v. *Tiburon* (1980) 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106].)

As the trial court recognized, a regulatory takings claim is not ripe for adjudication until the governmental entity charged with implementing the regulations has reached a final decision on the application of the land use regulations to the affected property.[4] (*Williamson Planning Comm'n* v. *Hamilton Bank, supra,* 473 U.S. at p. 186 [105 S.Ct. at p. 3116].) A court's reluctance to examine takings claims until a final decision has been made "is compelled by the very nature of the inquiry required by the Just Compensation Clause." (*Id.* at p. 190 [105 S.Ct. at p. 3118].) Although " '[t]he question of what constitutes a "taking" for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty,' " the Supreme Court consistently has indicated that among the factors of particular significance are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. (*Id.* at pp. 190-191 [105 S.Ct. at p. 3118].) "Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." (*Id.* at p. 191 [105 S.Ct. at p. 3119]; see also *Hensler* v. *City of Glendale, supra,* 8 Cal.4th at pp. 10-11.) Generally, a final decision requires at least (1) rejection of a formal development plan; and (2) denial of a variance, or something similar, from the controlling regulations. (*Williamson Planning Comm'n* v. *Hamilton Bank, supra,* 473 U.S. at pp. 187-188 [105 S.Ct. at pp. 3116-3117]; *Suitum* v. *Tahoe Regional Planning Agency, supra,* 520 U.S. at pp. 736-737 [117 S.Ct. at p. 1666]; *Milagra Ridge Partners, Ltd.* v. *City of Pacifica* (1998) 62 Cal.App.4th 108, 117 [72 Cal.Rptr.2d 394].)

In arguing that a final decision has been made for ripeness purposes, the claimant has the heavy burden of setting forth facts that are "clear, complete, and unambiguous" showing that the agency has "drawn the line, clearly and emphatically, as to the sole use to which [the property] may ever be put." (*Hoehne* v. *County of San Benito* (9th Cir. 1989) 870 F.2d 529, 533; see also

---

[4]The ripeness requirement applies to takings claims brought under both the federal and state Constitutions, and our Supreme Court has observed that state and federal law is coextensive in this area. (*Hensler* v. *City of Glendale* (1994) 8 Cal.4th 1, 9, fn. 4 [32 Cal.Rptr.2d 244, 876 P.2d 1043].) Accordingly, we will largely analyze the parties' claims under the more familiar federal standards.

*Long Beach Equities, Inc.* v. *County of Ventura* (1991) 231 Cal.App.3d 1016, 1032 [282 Cal.Rptr. 877].) After all, "[a] court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." (*MacDonald, Sommer & Frates* v. *Yolo County* (1986) 477 U.S. 340, 348 [106 S.Ct. 2561, 2566, 91 L.Ed.2d 285]; *Hensler* v. *City of Glendale, supra*, 8 Cal.4th at p. 12.) Thus, in attempting to show the regulation of the subject property is excessive, a property owner may need to resubmit modified development proposals that satisfy the governmental entity's objections to the development so that the extent of the regulation can be accurately identified. (See *MacDonald, Sommer & Frates* v. *Yolo County, supra*, 477 U.S. at p. 353, fn. 9 [106 S.Ct. at p. 2568].)

 The record reflects that Toigo has submitted, and the Town has denied, two development proposals—both for five-unit subdivisions.[5] In denying Toigo's 1994 application, the Town's council specifically adopted a finding that the proposed "subdivision and its improvements have environmental impacts that *are even more severe* than the impacts from the 1990 project that the Council denied." (Italics added.) The findings go on to state that the 1994 proposal "does not even incorporate important mitigation measures from the 1991 [EIR] for similar impacts that were identified for the 1990 project." Despite the severe environmental and safety constraints of their steep hillside property, Toigo has "made no attempt to alter their vision" of the intensity of development on their property. (*Kaiser Dev. Co.* v. *City and County of Honolulu* (D. Hawaii 1986) 649 F.Supp. 926, 942.) As the Supreme Court recognized in *MacDonald*, "[l]and use planning is not an all-or-nothing proposition. A governmental entity is not required to permit a landowner to develop property to [the] full extent he might desire or be charged with an unconstitutional taking of the property . . . ." (*MacDonald, Sommer & Frates* v. *Yolo County, supra*, 477 U.S. at p. 347 [106 S.Ct. at p. 2565].)

Toigo never seriously addresses or attempts to distinguish the numerous authorities cited by the Town requiring reapplication at a lower density before an agency decision will be considered final. (See, e.g., *MacDonald, Sommer & Frates* v. *Yolo County, supra*, 477 U.S. at p. 353, fn. 9 [106 S.Ct. at p. 2568]; *Pace Resources, Inc.* v. *Shrewsbury Tp.* (3d Cir. 1987) 808 F.2d 1023, 1033-1034; *Del Monte Dunes* v. *City of Monterey* (9th Cir. 1990) 920 F.2d 1496, 1501; see also *Executive 100, Inc.* v. *Martin County* (11th Cir.

---

[5]Toigo's continuing assertion that they have submitted "four different" applications to the Town is both misleading and has no bearing on the ripeness issue. Toigo withdrew two of the four applications before the Town could act on them. Courts have made clear that abandoned applications are not considered "meaningful" for ripeness purposes. (*Kinzli* v. *City of Santa Cruz* (9th Cir. 1987) 818 F.2d 1449, 1455.) In any case, none of the applications requested approval of less than five units of development.

1991) 922 F.2d 1536, 1541 [aggrieved landowner must "have sought variances or pursued alternative, less ambitious development plans"].) Instead, Toigo argues their taking claim is ripe under the "futility exception" to the requirement of a final decision. Under this exception, the submission of another development plan is excused if such an application would be an " 'idle and futile act.' " (*Martino* v. *Santa Clara Valley Water Dist.* (9th Cir. 1983) 703 F.2d 1141, 1146, fn. 2; see also *American Sav. & Loan Ass'n* v. *County of Marin* (9th Cir. 1981) 653 F.2d 364, 371.)

The futility exception is extremely narrow: "[T]he mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the excuse. [Citations.] To come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so)." (*Gilbert* v. *City of Cambridge* (1st Cir. 1991) 932 F.2d 51, 61, fn. omitted.) Our colleagues in Division Five have recently held that where a "general plan does not preclude all development," futility cannot be demonstrated in the absence of a development proposal that "conforms to the existing general plan or at least does not require as drastic a modification to present land use designations as an amendment to the general plan." (*Milagra Ridge Partners, Ltd.* v. *City of Pacifica, supra,* 62 Cal.App.4th at p. 120.)

 In support of its summary judgment motion on the futility argument, the Town presented a declaration from its town planner giving assurances that the Town had not made a final decision about the nature and scope of development that it would allow with respect to Toigo's property. His declaration indicates that approval or disapproval of any future development of Toigo's land would depend upon the nature of the development and that the Town would be receptive to a reduced-density development proposal that took into account the many valid concerns for this environmentally sensitive area. Implicit assurances were also made that if Toigo returned with a "well-conceived, environmentally-sensitive project to develop this site," the Town would not insist on strict compliance with the various planning requirements but instead would invoke its variance and exception procedures to permit some deviations. The declaration also asserted that, to date, Toigo had made no effort to explore the possibility of alternative development plans with the Town.

In summary, the Town's showing on summary judgment established: 1) the Town had not come to a final, definitive position about how it would apply the land use policies in issue to Toigo's parcel, and 2) the possibility remained open that Toigo would be granted an administrative reprieve from the planning requirements that defeated the first two development proposals if a well-designed reduced-density proposal was submitted. This showing,

standing alone, is sufficient to demonstrate that Toigo had not yet obtained a final decision regarding the application of the Town's planning requirements to its property, making summary judgment appropriate. (*Twain Harte Associates, Ltd.* v. *County of Tuolumne* (1990) 217 Cal.App.3d 71, 91 [265 Cal.Rptr. 737].) However, Toigo claims that the record before the trial court disclosed a material triable issue "about whether the owners' pursuit of the purported administrative remedy would have been futile" which precluded granting summary judgment to the Town. (*Ibid.*)

The primary evidence submitted by Toigo in attempting to raise a triable issue of fact consisted of the declaration of John Stuber, a member of the engineering firm hired to design and process Toigo's development proposals.[6] Stuber's declaration asserted that the submission of another development proposal would serve no useful purpose because the manner in which the last application was rejected makes it clear that no residential project will ever be approved. He pointed out that any residential proposal, regardless of the design or density, would require an access road and water tank. Because the access road in Toigo's most recent development proposal was found inconsistent with the general plan's environmental and safety policies, and the proposed 50,000-gallon water tank's location was found inconsistent with the Town's open space policies, Stuber concluded that no residential development would be permitted on the property and any future application would be futile.

In a detailed, comprehensive response, the town planner explained that the criticism of two components of Toigo's proposal, the access road and the water tank, did not represent a conclusive determination by the Town that Toigo will never be successful in advancing a residential application containing these components. Rather, it placed Toigo on notice that the five-unit subdivision proposal in question did not comply with current planning requirements but left open the possibility that these regulatory restrictions may be eased, or the negative impacts may be substantially mitigated, if Toigo undertakes less intensive development on the site. For example, the town planner asserted: "[T]he water system proposed in the 1994 application may not be the only possible system for providing water to this site; it is possible that waterlines could be upgraded and on-site tanks used to meet the needs of a less intensive development project. Even if a water tank is necessary, relocating it from the location shown in [Toigo's] 1994 proposal could substantially reduce impacts associated with grading an access road to the top of [Toigo's] property. The development of fewer units would also permit an access road with less severe environmental impacts. Because the

---

[6]The president of the engineering firm, Alan Cornwell, submitted a declaration essentially endorsing Stuber's conclusions.

units could be concentrated further downslope, emergency vehicles would not have to travel as great a distance along the steep grade to reach the units."

The trial court granted summary judgment, reasoning that Toigo's experts offered nothing more than speculation as to how the Town would ultimately apply its various land use policies to a hypothetical well-designed reduced-density proposal. The court pointed out that Toigo "themselves acknowledge that the Town has given 'the clear indication that [it] would look favorably upon a reduced density.' " The trial court found it reasonable to assume that a reduction in the size, scope, configuration, or density of the project as proposed would result in less adverse impacts in connection with the access road and water tank. Therefore, the court concluded that Toigo's experts "cannot competently predict how the Town would respond to a three-lot proposal—which might, for example, lessen cumulative earthwork and the total length of road that vehicles would have to travel in an emergency."[7]

Whether the declarations submitted by Toigo in opposition to the Town's motion for summary judgment show a material, triable issue of fact with respect to futility presents this court with a close question. However, when closely examined, the critical portions of Stuber's declaration constitute little more than unsupported conclusions and opinions and do not constitute the competent factual proof required to raise an issue of material fact on summary judgment. As explained in *Del Monte Dunes* v. *City of Monterey, supra,* 920 F.2d 1496, "The landowner bears the burden of establishing, *by more than mere allegations,* the futility of pursuing any of the steps needed to obtain a final decision. [Citation.]" (*Id.* at p. 1501, italics added.) Stuber's conclusory allegations of futility fall short of this standard.

The Town's recently amended zoning ordinance does not prohibit all economically viable use of Toigo's property. (See *Agins* v. *Tiburon, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141].) Under this zoning designation, up to three residential lots are permitted on the property. The Ross Municipal Code contains variance and exception provisions specifically for the purpose of accommodating development where, due to special topographic or other

---

[7]The trial court's observations are amply supported by a finding made by the Town's council in conjunction with the denial of Toigo's 1994 subdivision proposal. The finding reads: "The magnitude of the impacts of this development on the natural environment further demonstrates that the project proposes development at a level beyond what the land can physically accommodate. The roadway design, the water tank design, the lot configuration and driveway locations *are all dictated by the proposed development of this site as a five lot subdivision.* The severe environmental constraints of this parcel limit the amount of development that can occur on the site; *the proposed density for this project is fundamentally at odds with the site's physical characteristics.*" (Italics added.)

difficulties, strict compliance with planning requirements would deprive the owner of substantial property rights. Such variances or exceptions are available provided the proposed development substantially secures the objectives of the Town's regulations and is not detrimental to the public welfare. (See Ross Mun. Code, §§ 17.28.010, 17.28.020, 18.48.010-18.48.040.) The record contains a declaration from the Town's planner giving assurance that under these provisions, the "Town Council could approve a well-conceived, environmentally-sensitive project to develop this site even if the project satisfied most, but not all, Town policies and regulations." As recently held by the United States Supreme Court, "When such flexibility or discretion may be brought to bear on the permissible use of property as singular as a parcel of land, *a sound judgment about what use will be allowed simply cannot be made by asking whether a parcel's characteristics or a proposal's details facially conform to the terms of the general use regulations.*" (*Suitum v. Tahoe Regional Planning Agency, supra,* 520 U.S. at pp. 738-739 [117 S.Ct. at p. 1667], italics added.)

Consequently, the present case would be in a different posture if, for instance, Toigo had submitted a three-unit reduced-density proposal that made a legitimate attempt at satisfying the Town's objections to the development as initially proposed, only to have the Town reject that proposal without compromise, in spite of previous assurances that it would soften the strictures of the planning criteria if a more realistic, less-intensive plan was submitted. The problem in this case lies, as previously stated, in the fact that Toigo has not explored a reduction in size, scope, or intensity of the proposed development. Therefore, the inference that is sought to be raised from Toigo's showing on summary judgment—that the Town has applied the land use criteria it administers to the particular land in question in such a draconian fashion that reapplication for a modified plan would be futile—derives from nothing more than "speculation, conjecture, imagination or guess work," and is insufficient to raise a triable issue of fact. (*O'Neil v. Dake* (1985) 169 Cal.App.3d 1038, 1044 [215 Cal.Rptr. 732].) In this connection, the United States Supreme Court has observed that "[r]ejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews." (*MacDonald, Sommer & Frates v. Yolo County, supra,* 477 U.S. at p. 353, fn. 9 [106 S.Ct. at p. 2568].) Therefore, Toigo's takings claim will not be ripe "until it is in a position to allege not only that its initial permit applications were denied, but also that it has made some effort to pursue compromise with the [Town] that would allow some level of development." (*Landmark Land Co. of Oklahoma, Inc. v. Buchanan* (10th Cir. 1989) 874 F.2d 717, 721.)

There is nothing to the contrary in *Del Monte Dunes v. City of Monterey, supra,* 920 F.2d 1496, a case relied upon by Toigo in seeking to have the

trial court's grant of summary judgment overturned. In *Del Monte Dunes*, the court held that the landowners' further reapplication for development was not required and that a takings claim was ripe for review after the landowners and their predecessors submitted four residential development proposals. Each successive proposal reduced the project's density (from 344 units, to 264 units, to 224 units, and finally to 190 units) and addressed access and other issues to meet the criticism of the planning staff, the planning commission and the city council. Even though the landowners provided evidence they substantially fulfilled all the specified conditions for permitting development, the city abruptly changed course and disapproved the plan, even though the type and density of the proposed development substantially conformed to the city's land use plan and zoning ordinances. The court concluded that the futility requirement had been met because "[r]equiring appellants to persist with this protracted application process to meet the final decision requirement would implicate the concerns about disjointed, repetitive, and unfair procedures . . . ." (*Id.* at p. 1506.) Contrary to Toigo's assertions, this case is a far cry from *Del Monte Dunes*.

Toigo's futility argument also relies on a single statement allegedly made in 1992 by a former town councilmember, Peter Barry, to the effect that "we'll never let anybody develop that property." However, this statement, even if accurately reported, has no persuasive value regarding how the present members of the town council will vote when deciding whether to approve a formal application for development. Dr. Barry is no longer a member of the town council and his opinions—particularly those allegedly expressed in a social setting two years before the subdivision application at issue even existed—have absolutely no bearing on how the existing town council will act on future proposals. As the trial court put it, a statement "made by a former Councilmember nearly five years ago, does not indicate how the present and full Council would respond to a new development request." (Accord, *City of El Paso* v. *Madero Development* (Tex.App. 1991) 803 S.W.2d 396, 401.)

Accordingly, in considering the facts before us, we agree with the trial court's conclusion that the undisputed material facts show Toigo has yet to secure a final decision from the Town regarding the acceptable uses of their property, and the futility exception does not excuse this failure because a "meaningful application" has yet to be made. (*MacDonald, Sommer & Frates* v. *Yolo County, supra*, 477 U.S. at p. 353, fn. 8 [106 S.Ct. at p. 2568].) In so holding, we need not determine at which point reapplications for development will become futile. Under pertinent authority, we are not required to engage in "the virtual impossibility of determining what development will be permitted on a particular lot of land when its use is subject to the decision of

a regulatory body invested with great discretion, which it has not yet even been asked to exercise." (*Suitum* v. *Tahoe Regional Planning Agency, supra,* 520 U.S. at p. 739 [117 S.Ct. at p. 1667].) Thus, Toigo's claim for a taking in violation of the Fifth Amendment to the United States Constitution is not ripe and was properly dismissed on the Town's motion for summary adjudication.

## IV.

### DISPOSITION

The judgment is affirmed. Costs of appeal are awarded to respondents.

Kline, P. J., and Haerle, J., concurred.