Filed 9/20/22  Surfer's Point v. City of Encinitas CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SURFER'S POINT, LLC, | D079271 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2020-00039124-CU-WM-NC) |
| CITY OF ENCINITAS et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy M. Casserly, Blaine K. Bowman, Judges.  Affirmed as modified.

Smaha Law Group and Kristen Marquis Fritz for Plaintiff and Appellant.

Devaney Pate Morris & Cameron, Jeffery A. Morris and Wendy L. House for Defendants and Respondents.


Years after the original development permits for its project issued by the City of Encinitas (City) had expired by operation of law, Surfer's Point, LLC (SP), the developer in this case, attempted to resume its development project by applying for modifications to the original permits.  The City's

Planning Commission (PC) denied SP's application for modifications of its original development permits. After the Encinitas City Council (CC) denied SP's appeal of the PC's decision, SP filed a petition for writ of mandate and complaint for declaratory relief in the superior court. The court denied the writ petition to the extent that SP sought an order requiring the City to approve its application, but granted in part SP's request for declaratory relief.

On appeal, SP contends that the trial court erred by denying its request for writ relief, arguing that: (1) substantial evidence does not support the findings that the CC made in support of its denial of SP's appeal of the PC's decision denying its application; (2) equitable estoppel and/or promissory estoppel applied to bar the CC from denying its appeal and instead required that the CC approve SP's application; and (3) SP's modification application was "deemed approved" pursuant to Government Code section 65956, subdivision (b)[1] (§ 65956(b)) based on the PC's failure to timely approve or disapprove SP's application. We conclude that there is substantial, and undisputed, evidence to support the CC's finding that SP's original development permits had expired by operation of law years before SP attempted to resume the project, and were thus null and void. As a result, SP did not have valid development permits that could be modified. We also conclude that the trial court erred by granting in part SP's request for declaratory relief. We therefore modify the judgment to delete the award of declaratory relief. Accordingly, we affirm the judgment as so modified.

---

[1]    All statutory references are to the Government Code unless otherwise specified.

2

FACTUAL AND PROCEDURAL BACKGROUND

SP purchased a vacant 1.81-acre property located in the City's coastal zone at the northeast corner of the intersection of Highway 101 and La Costa Avenue (Property) in or about 1999. In 2005, SP filed an application with the City for permits to develop the Property and adjacent property to be leased from the North County Transit District (NCTD), with a 26-unit timeshare/hotel building (Project).[2] The PC approved a major use permit (MUP), design review permit (DRP), coastal development permit (CDP), and environmental impact report (EIR) for the Project in or about 2005. The PC's approvals were not appealed to the CC. After the City issued its notice of final action on the Project's CDP, the California Coastal Commission (CCC) appealed the City's approval of the CDP for the Project. The CCC later approved the CDP for the Project, but with special conditions addressing its concerns on November 16, 2007. On January 10, 2008, the CCC issued a draft notice of intent to issue the CDP. However, SP's efforts to develop the Project thereafter became dormant and no construction began.

SP resumed its efforts to develop the Project and met with City staff toward that goal in or about 2013. In a September 6, 2013 letter to SP, SP's land use counsel noted, based on information provided by SP, that City staff had apparently advised SP that staff believed the original MUP, DRP, and CDP remained valid, even though the CDP had expired in 2009. SP's counsel further noted that because of the expiration of the CDP, CCC staff had indicated that the Project would have to be reapproved by the City with notice to the public and the CCC before the Project could move forward.

_____

[2]     In March 2007, SP and the NCTD entered into a lease agreement giving SP contractual rights to develop the adjacent parcel as part of the Project.

3

Because SP apparently planned to proceed to reactivate the Project without further assistance of its counsel, SP's counsel advised SP regarding its two alternatives for proceeding with the Project: (1) seek a substantial conformance finding by City staff; or (2) if City staff found that the revised Project was not in substantial conformance with the original permits, SP would "need to file (i) an application for a coastal development permit issued by the City, and (ii) a major use permit and a design review permit, should the revised conditions of approval necessitate changes to the latter two permits. These will require a [PC] public hearing and, if appealed, a [CC] public hearing."

SP subsequently asked the City's planning department to confirm whether SP's proposed changes to the Project were in substantial conformance with the original permits. In a March 26, 2015 letter to SP, the director of the City's planning department stated his tentative finding that SP's changes to the Project could not be found to be in substantial conformance with the Project, as originally approved, and therefore, the PC would have to approve an application to modify SP's original permits for the Project. SP modified the design of the Project and submitted those changes to the CCC for its approval. In a June 19, 2015 letter to the City's planning department, a CCC analyst stated that the CCC's original approval of the Project had expired on November 16, 2009, which was two years after the date of its issuance, and that SP was therefore required to apply for a new CDP for the Project. The CCC analyst then set forth the special conditions required by the CCC for the original CDP, SP's response to those conditions, and issues that remained to be addressed.

In July 2017, SP and the NCTD entered into an amended and restated lease agreement, which authorized the City to proceed with the entitlement process for SP's leased property that was part of the Project.

SP filed an application with the City for modification of its original permits for development of the Project on August 29, 2017. In its application, SP stated: "This application is requesting a modification to the conditionally approved project Case No. 00-201 MUP/DR/CDP for a 26 unit timeshare/hotel development on vacant land. The project modification[s] are as a result of the CCC appeal of 2007 and recent project phasing due to NCTD double tracking project. Signage is added to this application." In particular, whereas the original Project was to be completed in a single phase, SP's proposed modifications provided that development of the Project would now be completed in two phases due to NCTD's double tracking project. After reviewing SP's application, City staff sent a letter to SP on December 21, 2017, informing it that its application was incomplete because of certain issues that might require redesign of the Project. After reviewing SP's revisions to the Project, City staff sent a letter to SP on August 20, 2018, informing it that its application was still incomplete. After receiving this letter, SP made further revisions to the Project.

SP submitted revised plans for the Project in April 2019, which City staff apparently deemed complete and submitted to the PC for its consideration. On May 30, the City gave notice of a PC public hearing to be held on June 6 pertaining to its consideration of SP's application.[3] In its agenda report, City staff recommended that the PC approve the application.

_____

[3] The City initially gave notice of a PC public hearing to be held on May 2, 2019, but subsequently gave notice of the June 6 public hearing because its May 2 notice was apparently inadequate.

5

The report described SP's application as requesting a major use permit modification (MUPMOD), a design review permit modification (DRPMOD), a coastal development permit (CDP), and a parcel map waiver (PMW) to consolidate three parcels into a single lot for construction of "a 25-unit timeshare hotel in two phases (Phase I with 14 units & Phase II with 11 units) and associated site improvements." At the June 6 hearing, the PC and members of the public discussed various issues related to the Project. At the conclusion of the hearing, the PC "CONTINUED OFF CALENDAR" (per the minutes of the June 6 PC meeting) its hearing on SP's application, apparently to allow SP and City staff to address issues that remained unresolved.

The City gave notice on June 4, 2020 of a PC public hearing to be held on June 18 on SP's application, based on SP's revisions to the Project. In its 995-page agenda report, City staff again recommended that the PC approve the application. In that report, City staff stated that SP's application asked that the PC consider "modifications to a [MUP] and [DRP] as well as the renewal of a [CDP]." SP's application also sought a PMW to consolidate three parcels into a single lot.

At the June 18, 2020 public hearing, the PC denied SP's application based on the following findings set forth in its minutes:

> "A.) Expiration of Design Review Permit
>
> "Based on Encinitas Municipal Code [(EMC)] Section 23.08.160 the [PC] finds that [DRP] 002888-2017 is expired as more than two years has [e]lapsed since the effective date of an approval of an application.
>
> "B.) Findings Based Upon [EMC] Section 23.08.080
>
> "The project is inconsistent with the North 101 Corridor Specific Plan Design Recommendations as it relates to the following:

6

"[descriptions of items (a) through (k)].

"The above environmental determination and findings are supported by the minutes, maps, and exhibits, and entire record of the hearing, including testimony, public comments, and commission discussion all of which are herein incorporated by reference."

Based on those findings, the PC denied all four permits (i.e., case No. 17-205 MUPMOD/DRMOD/PMW/CDP). On July 6, 2020, SP timely appealed to the CC, challenging the PC's denial of its application.

After giving notice of its public hearing, the CC heard SP's appeal of the PC's decision denying SP's application on August 19, 2020. SP requested that the CC vacate the PC's finding that the original DRP had expired and grant its requests for modification of the DRP, modification of the MUP, a CDP, and a PMW. In its agenda report for the August 19 hearing, City staff recommended that the CC approve SP's appeal, set aside the PC's decision denying SP's application, and instead approve that application. After hearing SP's argument and public comments, the CC issued Resolution 2020-78 in which it denied SP's appeal and upheld the PC's decision denying SP's application, stating:

"The findings required for approval of a [CDP] (EMC 30.080.090), a [MUP] (EMC 30.74.070) and a [DRP] (EMC 23.08.080) cannot be made. This conclusion is based on the following:

"[sets forth 10 specific findings]."

The eighth finding listed by the CC for denying SP's appeal states: "8. Pursuant to [EMC] Sections 23.08.160 (Design Review Permit) and 30.74.120 (Use Permit), there is substantial evidence in the record the [DRP] and [MUP] are null and void because two years passed after the effective date, construction had not started, and the [P]roject was not pursued diligently. An extension of the permit was not requested 15 days prior to the

7

date of expiration. The [P]roject was dormant between 2009 to 2013 with no activity completed."

SP filed the instant petition for writ of mandate and complaint for declaratory relief against the City and the CC on October 27, 2020. SP sought the following relief, among other things: (1) issuance of a writ of mandate ordering the City and CC to vacate the denial of SP's application for modification of its DRP, modification of its MUP, a new CDP, and a PMW and an order that those permits be issued; (2) declarations that (a) neither the PC nor the CC was permitted to evaluate whether SP's original DRP had expired because proper notice had not been given that the issue of expiration of the DRP would be raised at the public hearings, (b) its MUPMOD, CDP, and PMW were deemed approved pursuant to section 65956(b), (c) the CC was estopped from making a decision contrary to the PC's findings in 2005 approving the MUP and DRP, and (d) the CC's denials of the MUPMOD, DRPMOD, CDP, and PMW were not supported by its findings or the evidence; and (3) an award of reasonable attorney fees and costs.

The trial court issued a detailed 18-page minute order confirming its tentative ruling granting in part and denying in part SP's requested relief on April 6, 2021. The court concluded that although SP's 2005 permits appeared to have expired in 2007 by operation of law pursuant to provisions of the EMC, the CC could not adopt a formal resolution so concluding because it had not given public notice that the issue of the expiration of the permits would be considered at its August 19, 2020 hearing. Nevertheless, the court stated:

> "[T]he City was not *required* to hold a noticed public hearing in order for the original [p]ermits to actually expire. . . . [I]t is possible for a previously-valid permit to have expired by operation of law, but for no formal follow-up action to be taken on it. In other words, it is entirely possible that even if a matter is not properly noticed (such

8

that the City Council may have been without power to issue a formal resolution on the issue of expiration) the truth of the underlying facts may still be that the permit has expired by operation of law – there simply has not been a *formal ruling* to that effect."

The court proceeded to reject SP's argument that the City should be equitably estopped from denying the continued validity of its original 2005 permits because City staff had led SP to believe that those permits remained valid. Finally, the court summarily concluded that there was substantial evidence to support the remaining nine findings by the CC on which its denial of SP's appeal was based. Accordingly, the court concluded: "Ultimately, the impropriety of issuing an improperly-noticed formal ruling concluding that the original [p]ermits (or at least one of them) have expired does not materially amount to the relief that [SP] is seeking by way of the instant writ and declaratory judgment action."[4]

The trial court entered judgment on May 19, 2021, incorporating its April 6, 2021 minute order, directing the City to modify the CC's Resolution 2020-78 to remove its finding that there was substantial evidence that the original DRP and MUP permits were null and void because two years had passed since their effective dates without construction starting, and denying the remainder of the relief sought by SP. The court found that the nine other findings cited in the CC's Resolution 2020-78 were supported by substantial evidence. The court therefore denied SP's request for an order directing the City to reverse its decision to deny its application for a modification of the MUP, modification of the DRP, a new CDP, and a PMW.

---

[4]     As SP notes, the trial court did not address its argument that its application for the MUPMOD, CDP, and PMW was deemed approved pursuant to section 65956(b) based on the PC's failure to timely approve or disapprove its application.

9

SP timely filed a notice of appeal challenging the judgment. This court issued an order on June 20, 2022, requesting that the parties submit supplemental letter briefs addressing certain issues not previously briefed, and proposing to take judicial notice of certain EMC ordinances. We have received, and considered, the parties' supplemental briefs.

DISCUSSION

I

*Land Use Regulation Generally*

To establish a general framework before addressing the specific circumstances in this case, we begin with a brief discussion of the regulation of land use in California. A municipality "has broad authority, under its general police power, to regulate the development and use of real property within its jurisdiction to promote the public welfare." (*California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 455.) "Land use regulation in California has been a function of local government under the grant of police power contained in article XI, section 7 of the California Constitution." (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1151, fn. omitted (*Big Creek Lumber Co.*).) Accordingly, cities and counties are empowered to adopt general plans, specific plans, zoning ordinances, and other ordinances regulating the development of property within their jurisdictions. (*Id.* at pp. 1151-1152; *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1010; *Land Waste Management v. Contra Costa County Bd. of Supervisors* (1990) 222 Cal.App.3d 950, 957 (*Land Waste Management*).)

In enacting general plans and zoning ordinances, local agencies perform a legislative function. (*Big Creek Lumber Co., supra*, 38 Cal.4th at p. 1152; *Land Waste Management, supra*, 222 Cal.App.3d at p. 957.) In

10

contrast, "the grant of a land-use permit or variance is an adjudicatory act, rather than a legislative one. [Citation.] Adjudicatory decisions must be consistent with applicable land-use legislation. [Citations.]" (*Land Waste Management*, at p. 957.) "[A]dministrative decisions, such as variances and use permits, are adjudicative." (*Arnel Development Co. v. City of Costa Mesa* (1980) 28 Cal.3d 511, 518; see also, *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1211 (*Saad*); *Landi v. County of Monterey* (1983) 139 Cal.App.3d 934, 936.) "The permit process clearly involves the application of existing rules to a specific set of existing facts." (*Patterson v. Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 841.) The issuance of use permits and other land use decisions are inherently discretionary decisions. (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1182-1183; *Guinnane v. San Francisco City Planning Com.* (1989) 209 Cal.App.3d 732, 736, 740.) Local agencies often adopt ordinances requiring special permits for development of property, such as a design review permit, for which their approval is largely dependent on the provisions of the ordinance. (7 Miller & Starr, Cal. Real Estate (4th ed. 2021) § 21:10, p. 21-92.)

II

*Standards of Review*

Code of Civil Procedure section 1094.5 sets forth the procedure for judicial review of adjudicatory decisions made by administrative agencies. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 (*Topanga*).) Code of Civil Procedure section 1094.5, subdivision (b) provides:

> "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not

11

proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

In *Topanga*, the California Supreme Court stated: "[Code of Civil Procedure] [s]ection 1094.5 clearly contemplates that at minimum, the reviewing court must determine both whether substantial evidence supports the administrative agency's findings and whether the findings support the agency's decision." (*Topanga, supra*, 11 Cal.3d at pp. 514-515.) In *Young v. City of Coronado* (2017) 10 Cal.App.5th 408 (*Young*), this court stated:

> "The scope of review of supporting evidence for abuse of discretion depends on whether the decision substantially affects a fundamental vested right. (Code Civ. Proc., § 1094.5, subd. (c).) Where the public agency's decision affects a fundamental vested right, the trial court exercises independent judgment in assessing whether the evidence is sufficient to support the agency's findings. [Citation.] In such cases, the court conducts a limited trial de novo and 'abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence.' [Citations.] 'In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record.' (Code Civ. Proc., § 1094.5, subd. (c).)

> "Where . . . the underlying administrative mandamus case does not involve a fundamental vested right, on appeal ' "we review the administrative decision, not the superior court's decision." ' [Citations.]

> " '[T]he petitioner in an administrative mandamus proceeding has the burden of proving that the agency's decision was invalid and should be set aside, because it is presumed that the agency regularly performed its official duty. When the standard of review is the substantial evidence test . . . it is presumed that the findings and actions of the administrative agency were supported by substantial evidence. [Citations.] Thus, since the same

12

standard of review applies now on appeal as it did in the trial court, the burden is on appellant to show there is no substantial evidence whatsoever to support the findings of the Board.' [Citation.]" (*Id.* at pp. 418-419.)

To uphold an agency's decision, substantial evidence to support only one of the findings cited by the agency is sufficient. (*Breneric Associates v. City of Del Mar* (1998) 69 Cal.App.4th 166, 176 (*Breneric*) ["If [any] finding is supported by substantial evidence, the agency's rejection of the proposed development must be upheld"]; *Saad, supra*, 24 Cal.App.4th at pp. 1213-1215.) Accordingly, in applying the substantial evidence standard in reviewing the CC's decision, "[w]e examine the administrative record to determine whether there is substantial evidence to support [any] of the findings and conclusions upon which [the CC] relied to deny a design review permit [and major use permit] for [SP's] proposed project." (*Breneric*, at p. 176, fn. omitted.)

Under the substantial evidence standard of review, "the appellate court is not bound by the trial court's determinations but instead conducts a de novo examination of the administrative record to assess whether there is substantial evidence to support the administrative agency's findings and whether the findings support the agency's decision. The burden is on the petitioner to show there is insufficient evidence to support the agency's findings. [Citation.] Under this standard of review, we resolve all reasonable doubts in favor of the administrative findings and decision and reverse the administrative determination only if, based on the evidence before the agency, a reasonable person could not have reached the conclusion reached by the agency. [Citation.]" (*Breneric, supra*, 69 Cal.App.4th at pp. 174-175.)

However, in conducting our review for substantial evidence to support an agency's findings and decision, we decide de novo, or independently, any

13

questions of law based on undisputed facts. (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912-913; *Bostean v. Los Angeles Unified School Dist.* (1998) 63 Cal.App.4th 95, 107-108.) Likewise, "to the extent we are called upon to interpret statutes or [ordinances] . . . , such issues involve pure questions of law which we resolve de novo. [Citation.]" (*Bostean*, at p. 108; see also, *International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611; *Carmel Development Co., Inc. v. Anderson* (2020) 48 Cal.App.5th 492, 503; *Usher v. County of Monterey* (1998) 65 Cal.App.4th 210, 216 ["On review in this court, questions of statutory interpretation are questions of law warranting independent review"].) Accordingly, the application of an interpreted statute or ordinance to undisputed facts presents a question of law subject to our independent review. (*International Engine Parts, Inc.*, at p. 611.)

III

*Relevant Provisions of the Encinitas Municipal Code*

The EMC sets forth provisions regulating design review permits, major use permits, and coastal development permits for the development of property within the City's jurisdiction. On June 20, 2022, we issued an order proposing to take judicial notice of certain EMC ordinances that may be relevant to our disposition of this case and requesting that the parties submit letter briefs addressing whether we should take judicial notice of those ordinances. After considering the parties' briefs and oral arguments on appeal, we take judicial notice sua sponte of those ordinances.[5] (Evid. Code,

_____

[5] Specifically, we take judicial notice of the following EMC ordinances: EMC sections 23.08.020, 23.08.060, 23.08.070, 23.08.150, 23.08.160, 30.01.070, 30.74.020, 30.74.060, 30.74.070, 30.74.110, 30.74.120, 30.80.010, 30.80.020, 30.80.162, and 30.80.164.

14

§§ 451, subd. (a), 452, subd. (a), 459, subd. (a); *Tanimura & Antle Fresh Foods, Inc. v. Salinas Union High School Dist.* (2019) 34 Cal.App.5th 775, 797, fn. 13 [mandatory judicial notice of ordinances per Evid. Code, §§ 451, subd. (a), 459, subd. (a)]; *The Kennedy Com. v. City of Huntington Beach* (2017) 16 Cal.App.5th 841, 852-853 [discretionary judicial notice of ordinances per Evid. Code, §§ 452, 459]; *Reid v. City of San Diego* (2018) 24 Cal.App.5th 343, 368, fn. 12; *Madain v. City of Stanton* (2010) 185 Cal.App.4th 1277, 1280, fn. 1.)

*EMC design review permit ordinances.* EMC section 23.08.020 sets forth the necessity of issuance of a design review permit as a prerequisite to the issuance of other development permits, providing:

> "A.  Without first having obtained a design review permit, it shall be unlawful for any person to construct . . . any structure, when such activity is required by this chapter to have a design review permit.

> "B.  *No* building permit, grading permit or *other development permits shall be issued* relating to a structure or site development for which a design review permit is required *until the design review permit is obtained*."
> (Italics added.)

EMC section 23.08.070 sets forth the requirement for final determination by the PC or CC on a design review permit application, providing:

> "A.  A final determination by the [PC] or the [CC] on the application for a design review permit shall be made by written resolution, setting forth the facts which support the action. . . .

> "B.  An application for a design review permit shall be approved unless findings of fact are made based upon the information presented in the application or during the deliberations which support one or more of the regulatory conclusions contained in this chapter.  The decision maker shall elaborate on each of the regulatory conclusions made

15

in support of a denial in sufficient detail to explain as clearly as possible the reasons for the denial."

There are two EMC ordinances that, when considered together and applied to the undisputed facts in this case, precluded, as a matter of law, the approval of SP's application for a *modification of its original 2005 design review permit*. First, EMC section 23.08.150 sets forth the requirements for a *modification* of a design review permit, providing:

> "A proponent may apply for a *modification* of a *valid* design review permit. The application procedures, hearings and notifications for any modification shall be the same as for a new application. . . ." (Italics added.)

Second, EMC section 23.08.160 sets forth a two-year period during which a validly issued design review permit remains effective and declares the conditions under which that the design review permit may thereafter become "null and void," providing:

> "A. *The design review permit approval shall be valid for two years after the effective date of the permit*. A building permit and any other permit required for the construction of the project shall be obtained within the two-year period. *If construction has not started* within the time period specified in the City's adopted building code, *and is not diligently pursued thereafter, the design review permit shall be deemed null and void*.

> "B. The Director may, upon written request by the proponent, grant reasonable extensions of up to a total of two years for the design review permit; provided no change in City policies has occurred which would be in conflict with the project. A request for such an extension shall be filed with the Director at least 15 days prior to the expiration of the design review permit, together with the required application fee. Upon proper filing of an application of extension, public notice shall be made according to the provision of Chapter 30.01 as modified by this chapter. A public hearing is not required." (Italics added.)

16

*EMC major use permit ordinances.* EMC section 30.74.020 sets forth the necessity of issuance of a use permit as a prerequisite to the issuance of other development permits, providing:

> "A. Without first having obtained a use permit, it shall be unlawful for any person to construct a project when such project is required by the provisions of this Code to obtain a use permit.

> "B. *No* building permit or other *development permits shall be issued* relating to a project for which a use permit is required by this Code *until the use permit is obtained.*" (Italics added.)

EMC section 30.74.070 sets forth the requirement for a final determination by the PC on an application for a use permit, providing:

> "A. A final determination on the application for a use permit shall be made by written resolution if by the [PC] or by notice of determination if by the Director setting forth the facts which support the action.

> "B. An application for use permit shall be approved unless findings of fact are made based upon the information presented in the application or during the hearings which support *one or more of the following conclusions*:

> "1. The location, size, design or operating characteristics of the proposed project will be incompatible with or will adversely affect or will be materially detrimental to adjacent uses, residences, buildings, structures or natural resources . . . .

> "2. The impacts of the proposed project will adversely affect the policies of the Encinitas General Plan or the provisions of this Code; or

> "3. *The project fails to comply with any other regulations, conditions or policies imposed by this Code. . . .*" (Italics added.)

As was the case with respect to the DRP, there are two EMC ordinances that, when considered together and applied to the undisputed

17

facts in this case, precluded, as a matter of law, the approval of SP's application for a *modification of its original 2005 major use permit*. First, EMC section 30.74.110 sets forth the requirements for a *modification* of a use permit, providing:

> "A proponent may apply for a *modification* of a *valid* use permit. The application procedures, hearings and notifications for any modification shall be the same as for a new application. . . ." (Italics added.)

Second, EMC section 30.74.120 sets forth a two-year period during which a validly issued use permit remains effective and declares the conditions under which the use permit may thereafter become "null and void," providing:

> "A. *The use permit approval shall be valid for two years after the effective date of the permit.* A building permit and any other permit required for the construction of the project shall be obtained within the two-year period. *If construction has not started* within the time period specified in the City's adopted building code, *and is not diligently pursued thereafter, the use permit shall be deemed null and void.*
>
> "B. The Director may, upon written request by the proponent, grant reasonable extensions of up to a total of two years for the use permit; provided no change in City policies has occurred which would be in conflict with the project. A request for such an extension shall be filed with the Director and at least 15 days prior to the expiration of the use permit, together with the required application fee. Upon proper filing of an application for extension, public notice shall be made according to the provision of Chapter 30.01 as modified by this chapter. A public hearing is not required." (Italics added.)

*EMC coastal development permit ordinances.* EMC section 30.80.010 provides in part that, unless exempted, "[a] coastal development permit is required for all development within the Coastal Zone of the City." EMC section 30.80.020(B) provides that the PC "is authorized to render a final

18

determination for Coastal Development Permits" on applications for design review permits and major use permits.

Also, there are two EMC ordinances that set forth the period during which a validly issued coastal development permit remains effective. First, EMC section 30.80.162 provides: *"If substantial construction has not been completed* in reliance upon a granted coastal development permit *within a minimum of two years of the grant or a longer period as otherwise approved*, then upon notice to the property owner and an opportunity to present information to the Director, the Director may declare the coastal development permit to have *expired* with the privileges granted thereby canceled." (Italics added.) Second, EMC section 30.80.164 provides that the director of the City's planning department "may, on one or more occasions, extend the expiration period on the coastal development permit if [he or she] finds that there are no changed circumstances . . . . However, *the total of all extensions shall not exceed a period of two years. . . .*" (Italics added.)

## IV

*Substantial Evidence Supports the CC's Finding*
*That SP's 2005 Permits Were Null and Void*

SP contends that the trial court erred by denying its requested relief because substantial evidence did not support the findings that the CC made in support of its denial of SP's appeal from the PC's decision denying SP's development application for the Project. However, the undisputed evidence shows that the 2005 DRP and MUP expired by operation of law. We therefore conclude that there is substantial evidence to support the CC's finding that those permits were null and void. Because an application for modification requires existing valid permits, neither the CC nor the PC could approve SP's application for modification of those permits.

19

A

As discussed above, in its June 18, 2020 resolution, the PC made specific findings in support of its decision to deny SP's application, stating in part:

> "A.)  Expiration of Design Review Permit
>
> "Based on [EMC] Section 23.08.160 the [PC] finds that [DRP] 002888-2017 is expired as more than two years has [e]lapsed since the effective date of an approval of an application."

Based on this and other findings, the PC denied all four permits (i.e., case No. 17-205 MUPMOD/DRMOD/PMW/CDP).  On July 6, 2020, SP timely appealed to the CC, challenging the PC's decision denying its application.  In particular, SP appealed the PC's finding that its original 2005 DRP had expired due to lapse of time pursuant to EMC section 23.08.160.

After giving notice of its public hearing, on August 19, 2020, the CC heard SP's appeal of the PC's decision and issued Resolution 2020-78 denying SP's appeal and upholding the PC's decision denying SP's application, stating in part:

> "The findings required for approval of a [CDP] (EMC 30.080.090) [*sic*], a [MUP] (EMC 30.74.070) and a [DRP] (EMC 23.08.080) cannot be made.  This conclusion is based on the following:
>
> "[¶] . . . [¶]
>
> "8.  Pursuant to [EMC] Sections 23.08.160 (Design Review Permit) and 30.74.120 (Use Permit), *there is substantial evidence in the record the* [DRP] *and* [MUP] *are null and void because two years passed after the effective date, construction had not started*, and the [P]roject was not pursued diligently.  An extension of the permit was not requested 15 days prior to the date of expiration.  The [P]roject was dormant between 2009 to 2013 with no activity completed."  (Italics added.)

20

B

Based on our review of the administrative record, we conclude that there is substantial evidence to support the CC's decision to deny SP's appeal of the PC's denial of its application for modification of the DRP, modification of the MUP, a CDP, and a PMW. As discussed above, to affirm the CC's decision, we need find substantial evidence to support only one of the CC's 10 findings cited in support of its decision. (*Breneric, supra*, 69 Cal.App.4th at p. 176; *Saad, supra*, 24 Cal.App.4th at pp. 1213-1215.) Further, as we discuss below, the undisputed evidence shows that SP did not, either at the time of the June 18, 2020 PC public hearing or the August 19, 2020 CC public hearing, have any existing, valid development permit for the Project. Absent such an existing permit, SP did not have any fundamental vested right that could be affected at those hearings. We therefore apply the ordinary substantial evidence standard in reviewing the CC's findings and decision. (*Young, supra*, 10 Cal.App.5th at pp. 418-419; *Breneric*, at pp. 174-175; *Saad*, at p. 1213.) Contrary to SP's apparent assertion, the fact that its 2017 application sought modifications of its 2005 DRP and MUP, which were valid on their issuance in 2005, does not mean that SP's fundamental vested rights were affected such that it is entitled to de novo review. As discussed below, those 2005 permits had long expired by operation of law because construction had not started within the required two-year period and there was no request to renew those permits within the time period prescribed by ordinance. As a result, the permits had become null and void. (Cf. *Amerco Real Estate Co. v. City of West Sacramento* (2014) 224 Cal.App.4th 778, 783-784 ["Courts rarely uphold the application of the independent judgment test to land use decisions. [Citation.] Cases upholding such application typically involve 'classic vested rights'– i.e., a vested right to develop property in a particular

21

way"]; *Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1527.)

Applying that standard to the evidence in the administrative record in reviewing the CC's findings and its decision to deny SP's appeal, we first address the question whether there is substantial evidence to support the CC's finding number 8, which requires merely the application of EMC ordinances to the undisputed evidence in this case. Again, finding number 8 states:

> "Pursuant to [EMC] Sections 23.08.160 (Design Review Permit) and 30.74.120 (Use Permit), there is substantial evidence in the record that the [DRP] and [MUP] are null and void because two years passed after the effective date, construction had not started, and the [P]roject was not pursued diligently. An extension of the permit was not requested 15 days prior to the date of expiration. The [P]roject was dormant between 2009 to 2013 with no activity completed."

*Interpretation of EMC section 23.08.160.* In determining whether there is substantial evidence to support the CC's finding number 8, we first review the express language of the relevant ordinances cited by the CC. EMC section 23.08.160, as quoted above, provides: "The design review permit approval *shall be valid for two years* after the effective date of the permit. . . . If construction has not started within the time period specified in the City's adopted building code, and is not diligently pursued thereafter, the design review permit shall be deemed null and void." (Italics added.) Before applying EMC section 23.08.160 to the evidence in the record, we must initially interpret its language so as to effectuate the ordinance's purpose. (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 803.) Because the language of a statute or ordinance is generally the most reliable indicator of its legislative intent, we first examine

22

the words themselves, giving them their usual and ordinary meaning and construing them in context. (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663.) "If the language of the statute [or ordinance] is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary." (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919.) Applying those standards of statutory construction to the language of EMC section 23.08.160, we conclude that the usual and ordinary meaning of its language is unambiguous and that there is only one reasonable interpretation of that language. We therefore construe EMC section 23.08.160 as providing that if construction of a project for which a DRP has been issued has not started and been diligently pursued thereafter within two years after issuance of the DRP, the DRP expires by operation of law, becomes null and void, and is thus no longer valid.

*Expiration of the 2005 DRP*. Given our interpretation of EMC section 23.08.160, we conclude that the CC correctly interpreted that ordinance, properly applied it to the evidence in this record, and properly found that the 2005 DRP had expired by operation of law and was thus null and void. The PC approved SP's original application for a MUP, DRP, and CDP for the Project on September 1, 2005. Pursuant to EMC section 23.08.160, the 2005 DRP was "valid" for two years after that date (i.e., until September 1, 2007) and would be deemed "null and void" if construction had not started within the time period specified in the City's building code. The undisputed evidence in the record shows that construction of the Project did not start and was not diligently pursued thereafter during any relevant time period; as of this date, construction of the Project still has not begun—17 years after the issuance of the DRP in 2005. The undisputed evidence in the record further

23

shows that SP never timely filed a written request for an extension of the 2005 DRP for up to an additional two years (i.e., up to and through September 1, 2009), which it could have done pursuant to EMC section 23.08.160(B). There is thus substantial evidence to support the CC's findings that construction of the Project had not started and was not diligently pursued, that SP did not request an extension of the DRP, and that the Project "was dormant between 2009 to 2013 with no activity completed." Accordingly, under the express provisions of EMC section 23.080.160, there is substantial evidence to support the CC's finding that the 2005 DRP was thus null and void.

*SP's SC2 argument.* SP argued in the trial court, and argues again on appeal, that Specific Condition 2 (SC2), which was attached to the PC's 2005 resolution approving its DRP, and not EMC section 23.08.160, controls the expiration of its 2005 DRP, and maintains that SC2 extended the effective period of its development permits or at least required that the CC hold a public hearing pursuant to that specific condition. SC2 provided: "At any time after two years from the date of this approval, September 1, 2007 at 5:00 p.m., or the expiration date of any extension granted in accordance with the [EMC], the City *may* require a noticed public hearing to be scheduled before the authorized agency to determine if there has been demonstrated good faith intent to proceed in reliance on this approval. If the authorized agency finds that good-faith intent to proceed has not been demonstrated, the application shall be deemed expired as of the above date (or the expiration date of any extension)." (Italics added.) SP suggests that the language of SC2 should be interpreted as precluding the "automatic expiration" of the 2005 DRP by operation of law under EMC section 23.08.160 and to instead require that a hearing on that issue similar to the hearing that *Community*

24

*Development Com. v. City of Fort Bragg* (1988) 204 Cal.App.3d 1124 (*Fort Bragg*) suggested, in dicta, would be required for revocation of a conditional use permit. We disagree and decline to adopt SP's suggested interpretation of SC2. First, the express language of SC2 is permissive, not mandatory, using the word "may" instead of "shall." Accordingly, the City had the *option* to hold a public hearing on the issue of whether SP had shown a good faith intent to proceed in reliance on the City's approval of the 2005 DRP. The fact that SC2 gave the City that option did not preclude the 2005 DRP from expiring by operation of law under EMC section 23.08.160 because construction had not started on the Project. Further, based on the undisputed evidence in the record, it is clear that construction did not start within the two-year period after issuance of the DRP in 2005 and still has not started 17 years later. Accordingly, there could be no reasonable argument that SP, in fact, had a "good faith intent" to proceed in reliance on the City's approval of the 2005 DRP that would have precluded expiration of the DRP within the meaning of SC2 even if the City had elected to hold a public hearing on that issue, rather than simply allowing the 2005 DRP to expire by operation of law pursuant to EMC section 23.08.160. Finally, to the extent that SC2 was included as part of the PC's approval of SP's 2005 DRP because of the holding in *Fort Bragg*, we conclude, as discussed in Section VII(B) below, that the language in *Fort Bragg* regarding the public agency's possible consideration of revocation, rather than expiration, of the conditional use permit was dicta and, in any event, is inapposite to this case because the PC and CC did not consider *revocation* of any valid DRP. Instead, both the PC and the CC simply found that the 2005 DRP had *expired* by operation of law. Contrary to SP's assertion, SC2 did not have the effect of superseding EMC

25

section 23.08.160's provisions regarding the expiration by operation of law of the 2005 DRP.

*Interpretation of EMC section 30.74.120.* We next address the question whether there is substantial evidence to support the CC's parallel finding that SP's 2005 MUP expired by operation of law pursuant to EMC section 30.74.120 and was thus null and void. EMC section 30.74.120, as quoted above, provides: "The use permit approval shall be valid for two years after the effective date of the permit. . . . If construction has not started within the time period specified in the City's adopted building code, and is not diligently pursued thereafter, the use permit shall be deemed null and void." Because the language of EMC section 30.74.120 is identical to the language of EMC section 23.08.160, with the exception of the name of the development permit (i.e., DRP versus MUP), we incorporate our reasoning above in interpreting EMC section 23.08.160. Applying that reasoning in interpreting EMC section 30.74.120, we construe EMC section 30.74.120 as providing that if construction of a project for which a MUP has been issued has not started and been diligently pursued within two years after issuance of the MUP, the MUP expires by operation of law, becomes null and void, and is no longer valid.

*Expiration of the 2005 MUP.* Given our interpretation of EMC section 30.74.120, we conclude that the CC correctly interpreted that ordinance, properly applied it to the evidence in this record, and properly found that the 2005 MUP expired by operation of law and was thus null and void. Pursuant to EMC section 30.74.120, the original 2005 MUP was "valid" for two years after September 1, 2005 (i.e., until September 1, 2007) and was deemed "null and void" if construction had not started within the time period specified in the City's building code. As discussed above, the undisputed evidence in the

26

record shows that construction of the Project did not start and was not diligently pursued thereafter during any relevant time period; as of this date, construction of the Project still has not begun. The undisputed evidence in the record also shows that SP never timely filed a written request for an extension of its MUP for up to an additional two years (i.e., up to and through September 1, 2009), which SP could have done pursuant to EMC section 30.74.120(B). There is therefore substantial evidence to support the CC's findings that construction of the Project had not started and was not pursued diligently, that SP did not request an extension of the MUP, and that the Project "was dormant between 2009 to 2013 with no activity completed." Accordingly, under the express provisions of EMC section 30.74.120, there is substantial evidence to support the CC's finding that the 2005 MUP was null and void.

*Effect of expiration of 2005 DRP and MUP.* In its Resolution 2020-78, the CC stated in part: "The [CC] hereby denies the appeal filed by [SP] and upholds the [PC's] decision to DENY [SP's application for the modification of the original 2005 DRP, modification of the original 2005 MUP, a CDP, and a PMW] based on the following findings: [¶] The findings required for approval of a [CDP], [MUP] and [DRP] cannot be made . . . based on the following: [¶] [setting forth its 10 findings]." As discussed above, the CC's finding number 8 states that there was substantial evidence in the record showing that both the 2005 DRP and MUP were null and void because two years had passed after their effective dates and construction on the Project had not started. In reaching this conclusion, the CC expressly found that the expirations of the 2005 DRP and MUP rendered those development permits "null and void" under the ordinances discussed above (i.e., EMC § 23.08.160 and EMC § 30.74.120). In denying SP's appeal, the CC necessarily found, albeit

27

impliedly, that the fact that the 2005 DRP and MUP had expired by operation of law and were null and void meant that the 2005 DRP and MUP were no longer "valid." The import of that finding is shown when the EMC ordinances authorizing applications for modifications of DRPs and MUPs are considered.

First, EMC section 23.08.150, of which we have taken judicial notice, provides in relevant part: "A proponent may apply for a *modification* of a *valid* design review permit." (Italics added.) Applying the standards of statutory construction discussed above to the language of EMC section 23.08.150, we conclude that the usual and ordinary meaning of the language of the ordinance is unambiguous and that there is only one reasonable interpretation of this language. We therefore construe EMC section 23.08.150 as providing that a design review permit may be modified only if there is an existing "valid" design review permit to modify. Alternatively stated, if there is no existing "valid" design review permit, there can be no modification of a design review permit. The legal effect of EMC section 23.08.150 is that any application to modify an "invalid," or expired, design review permit must be denied. Neither the PC nor the CC has the authority under EMC section 23.08.150 to approve an application for modification of a design review permit that has expired by operation of law, become null and void, and is thus invalid. Applying EMC section 23.08.150's requirements for modification of a design review permit to SP's application for modification of its 2005 DRP, which the CC properly found had expired by operation of law and become null and void pursuant to EMC section 23.08.160, we conclude that the CC properly denied SP's appeal of the PC's denial of its application for a modified DRP. We further conclude that, based on finding number 8, the CC had no authority to grant SP's appeal and approve its application for

modification of its 2005 DRP because such a decision would have been in contravention of EMC section 23.08.150.

Second, EMC section 30.74.110, of which we have also taken judicial notice, similarly provides in relevant part: "A proponent may apply for a *modification* of a *valid* use permit." (Italics added.) Applying the standards of statutory construction discussed above to the language of EMC section 30.74.110, we conclude that there is similarly only one reasonable interpretation of that language. We therefore construe EMC section 30.74.110 as providing that a use permit may be modified only if there is an existing "valid" use permit to modify. The legal effect of EMC section 30.74.110 is that any application to modify an "invalid," or expired, use permit must be denied. Applying EMC section 30.74.110's requirements for modification of a use permit to SP's application for modification of its 2005 MUP, which the CC properly found had expired by operation of law and was thus null and void pursuant to EMC section 30.74.120, we conclude that the CC properly denied SP's appeal of the PC's denial of its application for a modified MUP. We further conclude that, based on finding number 8, the CC had no authority to grant SP's appeal and approve its application for modification of its 2005 MUP because such a decision would have been in contravention of EMC section 30.74.110.

*Substantial evidence to support the CC's denial of a CDP and PMW.*

SP appears to contend that even though there may be substantial evidence to support the CC's denial of its appeal of the PC's decision to deny SP's application to modify the 2005 DRP and MUP, there was no substantial evidence to support the CC's denial of its appeal as to the PC's denial of its application for a CDP and PMW. We disagree. First, SP's application for a modification of its 2005 DRP, a modification of its 2005 MUP, a CDP, and a

29

PMW appears to be a "joint" application for which the requested development permits are interdependent.  Therefore, the proper denial of one permit would implicitly require the denial of the other permits.  Second, and more importantly, as noted above, there are EMC ordinances that expressly make the issuance of a valid DRP and/or MUP a precondition to the issuance of other development permits.  In particular, EMC section 23.08.020(B) provides:  "*No* building permit, grading permit or *other development permits shall be issued* relating to a structure or site development for which a design review permit is required *until the design review permit is obtained*."  (Italics added.)  Applying the standards of statutory construction discussed above to the language of EMC section 23.08.020(B), we conclude that the usual and ordinary meaning of the language of the ordinance is unambiguous and that there is only one reasonable interpretation of this language.  We therefore construe EMC section 23.08.020 as providing that until the PC or CC issues a valid design review permit, no other development permits (e.g., MUP, CDP, or PMW) may be issued.  In effect, that ordinance makes the issuance of a valid DRP a precondition to the issuance of any other development permit.

EMC section 30.74.020(B) similarly provides:  "*No* building permit or *other development permits shall be issued* relating to a project for which a use permit is required by this Code *until the use permit is obtained*."  (Italics added.)  Applying the standards of statutory construction discussed above to the language of EMC section 30.74.020(B), we again conclude that the usual and ordinary meaning of the language of the ordinance is unambiguous and there is only one reasonable interpretation of this language.  We therefore construe EMC section 30.74.020 as providing that until the PC or CC issues a valid use permit, no other development permits (e.g., DRP, CDP, or PMW)

30

may be issued. In effect, that ordinance makes the issuance of a valid MUP a precondition to the issuance of any other development permit.[6]

Accordingly, we conclude that, in implicitly applying the provisions of EMC sections 23.08.020 and 30.74.020, the CC properly denied SP's appeal of the PC's denial of its application for a CDP and a PMW based on its denial of SP's appeal of the PC's decision to deny SP's application for modifications of its 2005 DRP and MUP. In effect, the CC impliedly found that the preconditions for the issuance of the CDP and PMW related to the Project were not satisfied because the existence of a valid DRP and valid MUP were required under EMC sections 23.08.020 and 30.74.020 before the CC had the authority to grant SP's appeal and approve its application for a CDP and PMW.[7] We therefore conclude that there is substantial evidence to support the CC's finding number 8, which, in turn, supports its denial of SP's appeal of the PC's decision to deny SP's application for a modification of the 2005 DRP, a modification of its 2005 MUP, a CDP, and a PMW. Because there is substantial evidence to support one of its findings, and this finding in turn supports the CC's administrative decision to deny SP's appeal, we need not,

---

[6]    Based on our reading of EMC sections 23.08.020(B) and 30.74.020(B), it appears that a DRP and MUP must be issued concurrently and that the issuance of both is a prerequisite to the issuance of any other development permit for a project.

[7]    In its briefing, SP does not make any specific argument regarding the PMW that it requested in connection with the Project, which would allow consolidation of three parcels into a single parcel. Based on our review of the record, it appears that SP's application for consolidation of those parcels was conditioned on approval of the other development permits for the Project. In any event, we conclude that SP has not carried its burden on appeal to show that there is not substantial evidence to support the CC's denial of its appeal of the PC's decision to deny SP's application for the PMW.

31

and do not, address whether there is also substantial evidence to support the other nine findings that the CC made in support of its decision. (*Breneric, supra*, 69 Cal.App.4th at p. 176; *Saad, supra*, 24 Cal.App.4th at pp. 1213-1215.)

V

*Declaratory Relief*[8]

A

*Equitable estoppel and promissory estoppel*

SP contends that even if there was substantial evidence to support the CC's denial of its appeal of the PC's decision to deny SP's application for the development permits for the Project, the trial court erred by not finding that the doctrine of equitable estoppel and/or promissory estoppel applied to preclude the City from denying SP's application for those development

---

[8]  SP's combined petition for writ of mandate and complaint for declaratory relief included several requests for declaratory relief. There is case law holding that the trial court should not issue declaratory relief in a writ proceeding. (See, e.g., *State of California v. Superior Court* (1974) 12 Cal.3d 237, 249 ["It is settled that an action for declaratory relief is not appropriate to review an administrative decision"]; *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 127 [same]; *City of Pasadena v. Cohen* (2014) 228 Cal.App.4th 1461, 1467, fn. omitted (*Cohen*) ["Declaratory relief . . . cannot be joined with a writ of mandate reviewing an administrative determination"]; *Tejon Real Estate, LLC v. City of Los Angeles* (2014) 223 Cal.App.4th 149, 154-155; *Guilbert v. Regents of University of California* (1979) 93 Cal.App.3d 233, 244 [request for declaratory relief cannot be joined with petition for writ of mandate reviewing administrative decision].) Accordingly, it appears that the trial court may have lacked the authority to consider the ancillary declaratory relief that SP requested. (Cf. *Cohen*, at p. 1467.) Because the requests for declaratory relief were raised without objection in the trial court, we assume for purposes of this opinion that the court had the authority to consider the requests and we exercise our discretion to address the merits of the issues as to which SP requested declaratory relief.

32

permits and/or from finding that the 2005 permits had expired by operation of law. In particular, SP cites evidence showing that City staff represented to SP that the 2005 DRP and MUP remained valid and that SP was therefore required to apply only for modifications of those permits in order for it to be able to resume development of the Project. We conclude that the trial court's findings that the doctrines of equitable estoppel and promissory estoppel did not apply in the circumstances of this case are supported by substantial evidence.

1. Procedural background. The record includes evidence showing that certain City planning department staff members advised SP that its 2005 DRP and MUP remained valid and recommended that SP file an application for modifications of the 2005 DRP and MUP in order to resume its efforts to develop the Project. In particular, in his declaration, Daniel Reedy, SP's principal, stated that in 2008, a City senior planner advised him that the City had a moratorium on permit expirations due to the recession. In 2012 and 2013, when SP resumed discussions with City staff, no one mentioned that the moratorium had terminated or that SP's 2005 permits had expired. In 2015, the planning department director informed SP that the 2005 DRP and MUP remained valid, but that SP would have to apply for modification of those permits because there were additional changes that would have to be made to the Project. Reedy stated in his declaration that at all times until 2020, City staff assured SP that its 2005 permits remained valid and that only modifications to those permits would be required.

On August 29, 2017, SP filed its application requesting modifications of the 2005 DRP and MUP and for approval of a new CDP. In its agenda report for the PC's June 18, 2020 public hearing on SP's application, City staff

stated that the 2005 DRP and MUP remained valid and recommended that the PC approve the application. At its June 18, 2020 public hearing, however, the PC found that SP's 2005 DRP had expired by operation of law and proceeded to deny SP's application.

In its agenda report for the CC's August 19, 2020 public hearing on SP's appeal of the PC's decision, City staff again stated that the DRP and MUP remained valid and recommended that the CC grant SP's appeal. At its August 19, 2020 public hearing, the CC, found that both SP's 2005 DRP and 2005 MUP had expired by operation of law and denied SP's appeal.

In its petition for writ of mandate, SP alleged that it would be inequitable for the City to deny its application and preclude it from developing the Project. In addition to requested writ relief, SP requested declaratory relief stating that the CC was estopped from making a decision contrary to the CC's findings in its 2005 resolution approving SP's 2005 DRP and MUP because the City's planning department had led SP to believe that its 2005 permits remained valid and SP had reasonably relied on those representations.

In its April 6, 2021 minute order, the trial court rejected SP's request for equitable relief, citing *Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309 (*Toigo*), in which the court stated:

> "The principle of estoppel . . . prohibits a governmental entity from exercising its regulatory power to prohibit a proposed land use when a developer incurs substantial expense in reasonable and good faith reliance on some governmental act or omission so that it would be highly inequitable to deprive the developer of the right to complete the development as proposed. . . . [¶] We note at the outset that [the developer] faces daunting odds in establishing estoppel against a governmental entity in a land use case. . . . [¶] . . .[T]here is no meaningful distinction between an estoppel claim and a vested right claim where

34

land use is at issue. [Citations.] In California, the developer's right to complete a project as proposed does not vest until a valid building permit, or its functional equivalent, has been issued and the developer has performed substantial work and incurred substantial liabilities in good faith reliance on the permit. [Citations.] Courts have yet to extend the vested rights or estoppel theory to instances where a developer lacks a building permit or the functional equivalent, regardless of the property owner's detrimental reliance on local government actions and regardless of how many other land use and other preliminary approvals have been granted. To the contrary, it has been stated that ' "[w]here no such permit has been issued, it is difficult to conceive of any basis for such estoppel." [Citations.]' [Citation.] California courts apply this rule most strictly . . . ." (*Toigo, supra,* 70 Cal.App.4th at pp. 321-322, fn. omitted.)

Applying *Toigo*, the trial court questioned whether SP had shown that a failure to apply equitable estoppel in this case would deprive SP of the right to complete its development as proposed, noting that further changes to the Project might have been required such that the Project would no longer match the Project as proposed at the time the 2005 permits were approved. The court also noted that SP did not have a valid building permit, or its functional equivalent, that would allow it to commence construction, as was required in order for equitable estoppel to apply under *Toigo*. The court stated: "[E]ven if the approved Permits can accurately be described as 'vested' (at least for a two-year time frame), it is not 'highly inequitable' (a standard emphasized by the *Toigo* court) to deprive [SP] of the opportunity to complete the Project as it existed in those original Permits because those Permits were never solid enough to build upon *as-is* until a [CDP] was approved." Finally, the court considered the doctrine of laches, and noted that SP had waited until 2013 to resume efforts to develop the Project and had not filed a complete application until 2019—long after its 2005 permits

35

had expired under the applicable EMC ordinances. The court stated: "It would be *particularly* improper in this case for equity to interpose to override the public policy behind the 'normal planning and review process' given this very significant passage of time (roughly 15 years) and how that passage of time may have altered the circumstances surrounding the Project." Accordingly, the court denied SP's request for equitable relief, stating: "For these many reasons, and in light of the general indication that a developer who seeks to invoke equitable estoppel 'faces daunting odds,' this Court concludes that this is not a proper case for the imposition of the doctrine of equitable estoppel." The court entered its judgment on May 19, 2021 denying SP's requested equitable relief.

2. Legal principles. Equitable principles originated "in the necessity for exceptions to the application of rules of law in those cases where the law, by reason of its universality, would create injustice in the affairs of men." (*In re Estate of Lankershim* (1936) 6 Cal.2d 568, 572-573.) "[T]he granting or withholding of equitable relief involves the exercise of judicial discretion." (*Fairchild v. Raines* (1944) 24 Cal.2d 818, 826.)

" 'The elements of the doctrine [of equitable estoppel] are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*City of Goleta v. Superior Court* (2006) 40 Cal.4th 270, 279.) Further, "[t]he [plaintiff's] detrimental reliance must be reasonable." (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261 (*Schafer*); see also, *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 35 (*Waller*).)

36

"Equitable estoppel against the government . . . is the exception, not the rule." (*Attard v. Board of Supervisors of Contra Costa County* (2017) 14 Cal.App.5th 1066, 1079.) In cases against the government, an additional requirement applies in land use cases: the court must expressly balance the injustice done to the private person with the public policy that would be supervened by invoking estoppel to grant development rights outside of the normal planning and review process. (*Id.* at pp. 1079-1080; *Toigo, supra*, 70 Cal.App.4th at p. 321.)

"The existence of equitable estoppel generally is a factual question for the trier of fact to decide, unless the facts are undisputed and can support only one reasonable conclusion as a matter of law. [Citation.] We review factual findings regarding the existence of equitable estoppel under the substantial evidence test. [Citation.] In a case involving equitable estoppel against the government, however, the existence of estoppel is in part a legal question to the extent it involves weighing policy concerns to determine whether the avoidance of injustice in the particular case justifies any adverse impact on public policy or the public interest. [Citations.] . . . [W]e review questions of law de novo." (*Schafer, supra*, 237 Cal.App.4th at pp. 1263-1264.)

3. Analysis. Based on our review of the record, we conclude that there is substantial evidence supporting the trial court's finding that the doctrine of equitable estoppel does not apply in the circumstances of this case to warrant the equitable relief that SP sought in its writ petition. The trial court relied, as do we, on the principles discussed in *Toigo, supra*, 70 Cal.App.4th 309, regarding the application of equitable estoppel in land use cases. In particular, there is substantial evidence supporting the trial court's finding

37

that SP did not have a building permit, or its functional equivalent, which would have allowed it to commence construction of the Project in its current or modified version at the time of the CC's decision. SP therefore did not have a vested interest that could be protected by the application of equitable estoppel. There is also substantial evidence to support the court's finding that SP had waited 15 years after the issuance of its permits in 2005 to seek equitable relief against the City, which weighed against the application of equitable estoppel.

Further, case law holds that developers generally may not reasonably rely on statements of public agency employees who are not authorized to make land use decisions, such as the approval of modifications of the DRP and MUP, a CDP, and PMW in this case. Those decisions were solely for the PC and CC to make under applicable EMC ordinances. In *Benson v. California Coastal Com.* (2006) 139 Cal.App.4th 348 (*Benson*), the court stated: "Everyone is presumed to know the law. [Citation.] Indeed, [the appellant] does not claim he was unaware that the Commission, not its staff, had the power to decide what action to take at the hearing. Under the circumstances, he could not reasonably rely on staff comments predicting what action the Commission would take." (*Id*. at p. 355.)

In this case, SP cannot reasonably claim that it was unaware of the relevant EMC ordinances authorizing the PC and CC, and not City staff, to make decisions on its application. Those EMC ordinances are publicly available. Further, in 2013, SP's counsel advised SP that if City staff determined that its revised Project was not in substantial conformance with its 2005 permits, then SP would "need to file (i) an application for a coastal development permit issued by the City, and (ii) a major use permit and a design review permit, should the revised conditions of approval necessitate

38

changes to the latter two permits. These will require a [PC] public hearing and, if appealed, a [CC] public hearing." While that advice is arguably ambiguous, SP's counsel did not advise SP to obtain *modifications* of its 2005 permits; rather, counsel advised SP to file applications for development permits. Further, regardless of SP's counsel's advice, SP cannot rely on any purported ignorance of relevant EMC ordinances regarding modification of development permits. Given the express provisions of the EMC ordinances and the legal advice that SP received from its own land use counsel, there is substantial evidence to support an implied finding by the trial court that SP could not demonstrate that it reasonably relied on any contrary representations or other statements by City staff. (*Schafer, supra*, 237 Cal.App.4th at p. 1261 [equitable estoppel requires that detrimental reliance be reasonable]; *Waller, supra*, 11 Cal.4th at p. 35 [same].) Finally, the trial court properly considered and weighed the relevant public policy considerations and concluded that equitable estoppel should not be applied in this land use case because of the public policy against interference with the City's normal planning and review process for issuance of land use permits. Accordingly, we conclude that substantial evidence supports the trial court's finding that the doctrine of equitable estoppel does not apply in the circumstances of this case.

Incorporating our reasoning above, we similarly conclude that there is substantial evidence to support the trial court's implied finding that the doctrine of promissory estoppel also did not apply. Accordingly, we conclude that the court did not err by denying SP's request for equitable relief under either the doctrine of equitable estoppel or the doctrine of promissory estoppel.

B

*Section 65956(b)*

SP contends that even if its 2005 development permits expired by operation of law, its application for modifications of those permits must be "deemed approved" pursuant to section 65956(b) because the PC did not timely approve or disapprove its application. We disagree.

1. Section 65956(b). Section 65956(b) is part of the Permit Streamlining Act (§ 65920 et seq.) (PSA), which was enacted in 1977 with the legislative purpose of expediting the processing of land use permits by public agencies. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1046-1047, abrogated by statute on other grounds as noted in *DeBerard Properties, Ltd. v. Lim* (1999) 20 Cal.4th 659, 668.) Section 65956(b) provides:

> "In the event that a lead agency or a responsible agency *fails to act to approve or to disapprove* a development project *within the time limits* required by this article, *the failure to act shall be deemed approval of the permit application* for the development project. However, the permit shall be deemed approved only if the public notice required by law has occurred. . . ." (Italics added.)

2. Doctrine of implied findings. As SP notes, in its April 6, 2021 minute order, the trial court did not expressly address SP's argument that its application should be deemed approved pursuant to section 65956(b) because the PC failed to timely approve or disapprove the application. However, SP does not discuss the import of that omission on our standard of review.

"To this appeal . . . , we apply basic tenets prescribing the scope and limits of appellate review, starting with the most fundamental--the presumption of correctness. An appealed judgment is presumed to be correct.

40

We will indulge all intendments and presumptions to support the judgment on matters as to which the record is silent and prejudicial error must be affirmatively shown. [Citation.] [¶] Particularly pertinent here, and not addressed by either side, is the doctrine of implied findings. This doctrine requires that in the absence of a statement of decision, an appellate court will presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record. In other words, the necessary findings will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence. [Citations.]" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267, fn. omitted (*Shaw*).) The doctrine of implied findings "is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error. [Citations.]" (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58 (*Fladeboe*).) "Failure to provide an adequate record on an issue requires that the issue be resolved *against appellant*. [Citations.]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2021) ¶ 8:17, p. 8-6.)

3. Analysis. SP's section 65956(b) argument is premised on the assumption that the PC did not timely approve or disapprove its application at its June 6, 2019 public hearing or at any time thereafter within 90 days of the date its application was deemed complete under the PSA. However, in so arguing, SP disregards what apparently occurred at the June 6, 2019 hearing and fails to provide an adequate record on that issue. The only concurrent statement in the administrative record showing what occurred at the June 6,

2019 PC hearing is a copy of the PC's minutes for that hearing, which states that its consideration of SP's application "was CONTINUED OFF CALENDAR." Those minutes do not contain any description of the discussions that occurred at the June 6, 2019 hearing on SP's application, and the record on appeal does not contain a transcript of that hearing. However, the parties agree that the record shows that at the June 6, 2019 hearing, members of the PC, as well as members of the public, raised a number of significant issues relating to the Project as proposed in SP's application. In particular, the City staff's subsequent agenda report for the CC's August 19, 2020 public hearing on SP's appeal noted those issues, stating: "The [PC] considered the [P]roject on June 6, 2019 and [the hearing] was continued off-calendar to allow [SP] to address various issues, which are listed below." That agenda report also described events occurring after the PC's June 6, 2019 hearing, stating: "Subsequent to the June 6, 2019 hearing, [SP] questioned the legal purview of the [PC] to request significant changes on the application . . . . [SP] submitted an alternative design for the east elevation [of the Project] to soften the view to address the [PC's] concerns raised at the June 6, 2019 hearing. Though [SP] did not address all of the [PC's] concerns (see list below), staff determined the changes to be an improvement to the previous decision. However, staff informed [SP] that modifying the design will expand the City's legal authority under the [DRP] to request additional modifications beyond the limited scope of improvements being requested as part of the subject application. [SP] requested to move forward to the June 18, 2020 [PC] hearing with the original design with a supplemental request to include the revised east elevation as an option for the [PC] to consider." The report then states: "The [PC] held a second hearing on June 18, 2020 to consider the subject application request. At that

42

hearing, staff provided responses to the various issues raised by the [PC] at the June 6, 2019 hearing as follows (see staff's response[s] in italics below [regarding] each item): . . . ." The list of issues set forth in the agenda report that had apparently been raised at the PC's June 6, 2019 hearing includes landscaping, beach sand replenishment, bulk and mass concerns pertaining to scenic view corridors, step down of Phase II building with slope and inclusion of single-story elements to enhance views from street, increase articulation from street, parking, need for photo simulations from a street level perspective regarding effect on views, and the lack of a pedestrian sidewalk on an adjacent street. At its June 18, 2020 public hearing, the PC considered SP's revisions to the Project and denied its application for the development permits.

Applying the presumption of correctness and the doctrine of implied findings, we presume that, in denying SP's requested relief, the trial court impliedly found that SP's application was not deemed approved pursuant to section 65956(b). Further, we presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record. (*Shaw, supra*, 170 Cal.App.4th at p. 267.) One such finding would be that, in light of the issues raised by members of the PC and public at the June 6, 2019 hearing, SP withdrew its application for development permits based on its existing version of the Project rather than have the PC deny its application at that hearing, thereafter revised its plans for the Project to address those issues, and resubmitted those plans to the PC for its consideration in 2020. The court could have further found that because SP effectively withdrew its application at the June 6, 2019 hearing, the time period within which the PC was required to approve or disapprove SP's application (as of June 6, 2019) ceased to run and therefore, the

43

application was not "deemed approved" pursuant to section 65956(b). Based on our review of the administrative record, as discussed above, there is substantial evidence to support these implied findings. The PSA does not contain any provisions precluding an applicant from submitting a complete application for a development permit and thereafter withdrawing it. (Cf. *Linovitz Capo Shores LLC v. California Coastal Com.* (2021) 65 Cal.App.5th 1106, 1119-1120 (*Linovitz*) [implicitly recognizing that applicants may withdraw applications, but concluding in that case that substantial evidence supported trial court's finding that applicant had not, in fact, withdrawn its application, so application was deemed approved pursuant to § 65956(b)].) Although the record on appeal does not contain any evidence showing that SP expressly withdrew its application at the June 6, 2019 hearing, SP did not provide any transcript of the PC's June 6, 2019 hearing that may have shown its express withdrawal of its application so that it could revise its Project in light of the issues raised at that hearing. Also, there is nothing in the record showing that SP objected to the June 6, 2019 being continued off calendar. The minutes from the PC's June 6, 2019 meeting stating that the PC's consideration of SP's application was "CONTINUED OFF CALENDAR," support an implied finding that SP withdrew its application. In addition, SP's subsequent resubmission of its revised Project in 2020 further supports an implied finding that it had withdrawn its application on June 6, 2019, and effectively filed a new application for that revised Project in 2020. By not including a transcript or other evidence showing what transpired at the PC's June 6, 2019 hearing, we conclude that SP failed to provide an adequate record on the issue; that failure requires that we resolve against SP the factual question of the withdrawal of its application at the June 6, 2019 hearing. (*Fladeboe, supra,* 150 Cal.App.4th at p. 58; Eisenberg et al., Cal.

44

Practice Guide: Civil Appeals and Writs, *supra*, at ¶ 8:17, p. 8-6.) Accordingly, we conclude that there is substantial evidence to support the trial court's implied finding that SP's application, as considered by the PC on June 6, 2019, was not deemed approved pursuant to section 65956(b), but rather, that SP withdrew the application at that hearing. We further conclude that on SP's resubmission of its revised Project in 2020, the PC timely denied its application at its June 18, 2020 hearing and therefore, complied with the PSA's requirements for timely approval or disapproval of land use permit applications. Accordingly, the trial court correctly rejected, albeit impliedly, SP's section 65956(b) argument.

C

*The CC's finding that the 2005 permits had expired*

Finally, we address the trial court's award of declaratory relief to SP. In its judgment granting in part and denying in part SP's request for declaratory relief, the trial court found that because the City had not provided SP with notice that the issue of the validity of the 2005 permits would be considered by the CC at its August 19, 2020 hearing, the CC was without power to find that the 2005 permits had expired and were null and void. Accordingly, in its judgment, the court directed the City to modify its Resolution 2020-78 to remove the language set forth in finding number 8.

1. Consideration of issue on appeal. Although the City has not filed a cross-appeal challenging the judgment to the extent that the trial court directed it to remove the language of finding number 8 from its Resolution 2020-78, we nevertheless exercise our inherent discretion to address the issue of whether the court erred by ordering the City to do so.

45

The CC's finding in its resolution that the 2005 permits were null and void is central to our disposition of SP's appeal. We conclude that the trial court's determination that the CC could not make such a finding due to lack of proper notice to SP is so "interwoven" with the issue of the validity of the 2005 permits that we may exercise our discretion to address that determination and, if erroneous, modify the judgment accordingly. (Cf. *Hong Sang Market, Inc. v. Peng* (2018) 20 Cal.App.5th 474, 487-488; *City of Santa Maria v. Cohen* (2017) 11 Cal.App.5th 96, 107-108; *In re Marriage of Garrity & Bishton* (1986) 181 Cal.App.3d 675, 690; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:197, p. 8-162.) "The test of whether a portion of a judgment appealed from is so interwoven with its other provisions as to preclude an independent examination of the part challenged by the appellant is whether the matters or issues embraced therein are the same as, or inter-dependent upon, the matters or issues which have not been attacked." (*American Enterprise, Inc. v. Van Winkle* (1952) 39 Cal.2d 210, 217.) In California, "when an appeal is taken from a portion of a judgment which cannot be separated from the remainder of it," that appeal "brings before the reviewing court all of the nonseverable portions." (*Ibid.*) In the circumstances of this case, we conclude, as discussed below, that we may review the trial court's consideration of the question whether the City gave proper notice regarding the CC's consideration of the expiration of the 2005 permits at its public hearing on SP's appeal of the PC's denial of its application, because that question directly relates to our determination that there was substantial evidence to support the CC's finding number 8 and thus, its denial of SP's appeal. If left unaddressed, the trial court's determination that the language of finding number 8 must be removed from

46

the CC's Resolution would result in an internally inconsistent judgment. (*Ibid.*)

2. Analysis. Based on our review of the record, it is clear that the City gave proper notice of the CC's August 19, 2020 public hearing on SP's appeal of the PC's denial as such notice was required by statutory and EMC provisions. First, the Government Code sets forth certain notice requirements for public hearings on land use permits or other development permits. Section 65905 provides: "(a) . . . [A] public hearing shall be held on . . . an application for a conditional use permit or equivalent development permit, a proposed revocation or modification of a variance or use permit or equivalent development permit, or an appeal from the action taken on any of those applications." The City was therefore required to hold a public hearing on the CC's consideration of SP's appeal from the PC's denial of SP's application. Section 65905, subdivision (b) provides: "Notice of a hearing held pursuant to subdivision (a) shall be given pursuant to Section 65901." Section 65901, subdivision (a) sets forth the manner of publication for notices of public hearing, which is not an issue in this case. Section 65901, subdivision (b) provides: "The notice shall include the information specified in Section 65094." Significantly, section 65094 provides: "As used in this title, 'notice of public hearing' means a notice that includes the date, time, and place of a public hearing, the identity of the hearing body or officer, *a general explanation of the matter to be considered*, and a general description, in text or by diagram, of the location of the real property, if any, that is the subject of the hearing." (Italics added.)

The EMC sets forth similar provisions requiring that the City provide notice of its public hearings on certain land use decisions. In particular,

47

EMC sections 23.08060(F) and 30.74.060(F) require that the CC consider the approval or disapproval of an application for a DRP or MUP at a "noticed, public hearing." EMC section 30.01.070(A) provides: "When a noticed, public hearing must be conducted the following shall apply: [¶] 1. Notice shall contain the date and time set for hearing which shall not be less than 10 nor more than 40 calendar days from the date of notice. *Notice shall describe the purpose of the hearing* and a description of the areas affected." (Italics added.)

After the PC made its June 18, 2020 determination denying SP's application, the City issued its notice of the CC's August 19, 2020 public hearing on SP's appeal of the PC's decision, which set forth information regarding the case number, application filing date, and location of the project. The notice then described SP's project, stating: "To consider an *appeal of* the [PC's] *denial of a Major Use Permit Modification, Design Review Permit Modification, Parcel Map Waiver and Coastal Development Permit* to modify a previously approved 25-unit timeshare hotel constructed in two phases with associated updated landscape/site improvements and a temporary construction trailer. The project also includes a request to consolidate three existing legal lots into one parcel." (Italics added.)

Based on our review of the language of the notice of the CC's public hearing, we conclude that the notice complied with all statutory and ordinance requirements for notices of public hearings on the relevant land use decisions. In particular, the City's notice of the CC's August 19, 2020 public hearing on SP's appeal of the PC's decision described the purpose of that hearing as being for the purpose of the CC's consideration of SP's appeal of the PC's "denial of a Major Use Permit Modification, Design Review Permit Modification, Parcel Map Waiver and Coastal Development Permit." In so

48

doing, the City's notice of the CC's August 19, 2020 public hearing properly set forth "*a general explanation of the matter to be considered*" by the PC within the meaning of section 65094 and the "*purpose of the hearing*" within the meaning of EMC section 30.01.070(A)(1). (Italics added.)

Contrary to SP's arguments in the trial court, the City's notice of the CC's public hearing was *not* required to set forth, in detail, every possible finding that the CC might make in support of its consideration of SP's appeal. Neither the Government Code sections nor the EMC ordinances, quoted above, require such detail in a notice of public hearing. Rather, only a "general explanation" or description of the "purpose" of the hearing is required. (§ 65094; EMC § 30.01.070(A)(1).) SP does not cite, nor are we aware of, any statutory or case authority requiring that notices of public hearings on land use decisions set forth, in detail, all possible findings that the public agency might make in approving or denying an application for a development permit or an appeal of a decision approving or denying such an application. Further, even assuming that SP's appeal to the CC involved fundamental vested rights and/or its right to procedural due process, SP does not cite, nor are we aware of, any case holding that notices of public hearings on such vested rights must provide more than a notice of the hearing, including the date of the hearing and a description of the matter to be considered at that hearing, and an opportunity to be heard at that hearing. On the contrary, case law holds that procedural due process generally does not require that notices of public hearings be detailed regarding the possible specific issues to be considered and possible specific findings that might be made by a public agency. (See, e.g., *Linovitz, supra*, 65 Cal.App.5th at pp. 1123-1125; *Benson, supra*, 139 Cal.App.4th at p. 353 [notice of public hearing was adequate even though it did not apprise appellant of specific

49

issues to be considered at hearing].)  The California Supreme Court has "refrain[ed] from describing a specific formula which details the nature, content, and timing of the requisite notice."  (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 618.)  Nevertheless, the court held that "notice must, at a minimum, be reasonably calculated to afford affected persons the realistic opportunity to protect their interests."  (*Id.* at p. 617.)  Alternatively stated, a notice of public hearing must apprise interested parties of the pending public hearing that may affect their property interests and an opportunity to present their objections.  (*Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1072.)  "All that is required is that the notice be reasonable."  (*Pacific Gas & Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4h 812, 860.)  The court in *Laupheimer v. State of California* (1988) 200 Cal.App.3d 440, held that a notice of public hearing need not contain asserted procedural details, but rather, that the notice need only be reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to be heard on that action.  (*Id.* at p. 453, citing *Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314.)

Applying the above standards for notices of public hearings to the City's notice of the CC's August 19, 2020 public hearing, we conclude that notice satisfied applicable statutory requirements, as well as procedural due process.  That notice provided SP, as well as nearby property owners and other interested members of the public, with notice of the matter to be considered by the CC at its August 19, 2020 public hearing, including a sufficient description of that matter, and an opportunity to be heard on the matter.  Specifically, the notice for the CC's August 19, 2020 public hearing sufficiently described the matter to be considered as the CC's consideration of

50

SP's appeal of the PC's denial of its application for modification of the DRP, modification of the MUP, a CDP, and a PMW. Nothing more was required. Accordingly, in considering SP's appeal of the PC's denial of its application for modification of, or issuance of, those development permits, the CC could properly consider all relevant factors, and make all specific findings of fact supported by the evidence, in making its decision to approve or deny SP's appeal. In so doing, the CC could, as discussed below, consider whether modifications of the DRP and MUP could be properly approved if those permits had expired by operation of law and therefore were no longer valid (i.e., were null and void). In particular, in deciding SP's appeal of the PC's decision, the CC could properly consider the expiration of the DRP by operation of law, which the PC expressly cited as one basis for its denial of SP's application.

Contrary to SP's argument, the omission from the notice of public hearing of any detailed description of the CC's consideration of the specific issue of the validity of the 2005 permits in considering SP's appeal did not preclude the CC from properly making findings on that issue if supported by substantial evidence. To the extent that SP relies on *Fort Bragg* as support for its argument, we conclude that the language on which SP relies is dicta and, in any event, *Fort Bragg* supports, rather than undermines, our conclusion that the City's notice of public hearing in this case allowed the CC to properly consider the issue of the validity of the 2005 permits and their expiration by operation of law. First, *Fort Bragg* concluded that the trial court erred by misconstruing the phrase "substantial evidence of use in progress" as requiring actual construction of buildings in order to avoid expiration of a conditional use permit and, based thereon, reversed the trial court's judgment denying the petition for writ of mandate requesting

51

reinstatement of that permit after the public agency found that the permit had *expired*. (*Fort Bragg, supra*, 204 Cal.App.3d at pp. 1129-1132.) Because the ordinance in *Fort Bragg* is inapposite to the EMC ordinances regarding expiration of the DRP and MUP in this case, *Fort Bragg*'s holding on that issue is irrelevant to the proper interpretation and application of the EMC ordinances. Second, although *Fort Bragg* discussed the possibility that the public agency's action could be interpreted as *revoking*, as opposed to making a finding of expiration of, the conditional use permit, it concluded that the issue of revocation was not properly before the public agency because the agency had not given notice that the issue of revocation, as opposed to expiration, would be considered at the public hearing. (*Id.* at pp. 1131-1132.) The court concluded that although the public agency had given notice that the issue of expiration of the conditional use permit would be considered at the hearing, the notice did "not afford[ ] notice of the city council's intention to consider revocation" of that permit at its hearing. (*Id.* at p. 1132.) Rather, "[t]he hearing solely concerned the expiration of the permit in light of whether substantial evidence of use had been demonstrated . . . . Any attempted revocation is therefore a nullity." (*Ibid.*) In so holding, *Fort Bragg*, albeit in dicta, distinguished between a public agency's consideration of the issue of expiration of a permit and its consideration of revocation of a permit. (*Ibid.*)

In the circumstances of this case, the record shows that, unlike the public notice in *Fort Bragg*, the City's notice of the CC's public hearing did not expressly state that the CC would decide the issue of expiration of SP's 2005 DRP and MUP. Nevertheless, the City's notice of the CC's public hearing properly gave notice of the purpose of the hearing, which implicitly included the CC's consideration of any relevant factors or evidence in support

52

of, or opposition to, the PC's denial of SP's application, including the PC's finding that the 2005 DRP had expired by operation of law and its denial of all four permits, which was presumably based on the fact that a valid DRP must be issued before any additional development permits may issue.[9]

For the foregoing reasons, we conclude that the trial court erred by directing the City to remove from the CC's August 19, 2020 resolution denying SP's appeal its finding number 8, as quoted above.[10] We therefore modify the judgment by deleting that order and thereby, in effect, reinstate the CC's finding number 8.[11]

## DISPOSITION

The judgment is modified to delete the following language: "The Court directs the City of Encinitas to modify City Council Resolution 2020-78 to remove the following: [¶] Pursuant to Encinitas Municipal Code Sections 23.08.160 (Design Review Permit) and 30.74.120 (Use Permit), there is substantial evidence in the record that the Design Review and Major Use Permits are null and void because two years passed after the effective date,

---

[9]     To the extent that SP argues that the CC's decision was, in effect, a revocation of its 2005 permits, our conclusion that those permits expired by operation of law disposes of that contention; there can be no meaningful revocation of an expired permit.

[10]     In so concluding, the trial court did not cite any case law in support of its conclusion that the notices for the PC's and CC's public hearings were required to set forth the issue of the validity of the DRP and MUP or expiration thereof or, for that matter, other specific issues or possible findings, in order for those issues to be properly addressed at the hearings. In particular, although the trial court discussed the *Fort Bragg* case in general, as noted, that case supports, rather than conflicts with, our conclusion in this case.

[11]     The trial court nevertheless found, as noted *ante*, that SP's 2005 permits expired in 2007 by operation of law pursuant to provisions of the EMC.

construction had not started, and the project was not pursued diligently.  An extension of the permit was not requested 15 days prior to the date of expiration.  The project was dormant between 2009 to 2013 with no activity completed."  The judgment is further modified to revise the sentence in line nine on page two to read as follows:  "The relief sought by Surfer's Point, LLC in the Motion is hereby denied."  As so modified, the judgment is affirmed.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

HALLER, J.